WATERBURY PETROLEUM PRODUCTS, INC. *v.*
CANAAN OIL AND FUEL COMPANY, INC., ET AL.
(10733)

PETERS, HEALEY, PARSKEY, SHEA and SPONZO, Js.

Argued November 10, 1983—decision released May 22, 1984

*David S. Golub,* with whom was *Stanley A. Twardy, Jr.,* for the appellants-cross appellees (defendant C. A. Lindell & Son, Inc., et al.).

*Michael F. Dowley,* with whom, on the brief, was *Michael Feldman,* for the appellee-cross appellant (plaintiff).

*Joseph I. Lieberman,* attorney general, *John M. Looney, Jr.,* assistant attorney general, and *Robert M. Langer,* assistant attorney general, filed an amicus curiae brief.

ARTHUR H. HEALEY, J. The plaintiff, Waterbury Petroleum Products, Inc., hereinafter WPP, brought this action against Canaan Oil & Fuel Co., Inc.,[1] C. A. Lindell & Sons, Inc., and Russell J. Riva, Jr., hereinafter referred to as Canaan Fuel, Lindell, and Riva, respectively, seeking damages under the law of conversion and the Connecticut Unfair Trade Practices Act, hereinafter CUTPA, as well as restraining and mandatory injunctive relief. After a trial before *Lexton, J.,* the court rendered judgments[2] which granted the requested injunctive relief and found the defendants liable for money damages under both the law of conversion and CUTPA. Lindell and Riva have appealed and WPP has cross appealed.

On their appeal, the defendants claim that the trial court erred: (1) in concluding that certain fuel oil storage tanks were personal property belonging to the plaintiff; (2) in awarding damages, other than the monetary value of the storage tanks, where such damages are not included within the proper measure of damages for conversion and were not pleaded by the plaintiff; (3) in concluding that the alleged acts of the plaintiff, which were not pleaded and which occurred in a time frame unrelated to the period at issue in the plain-

---

[1] In the proceedings below, the plaintiff filed a motion for default for failure to plead which was granted as against Canaan Oil & Fuel Co., Inc. It would appear that the defendant Canaan Oil & Fuel Co., Inc., did not defend at trial and is not involved in this appeal.

[2] In its initial memorandum of decision and judgment, the trial court left certain items of damage in abeyance with regard to the liability of Lindell and Riva, the determination of which is contained in a supplemental memorandum of decision and judgment rendered by the trial court and also at issue on this appeal.

tiff's complaint, could form a basis for recovery under CUTPA as that statute was in effect in 1977; and (4) in denying the defendants' motions to "reopen" and set aside judgment.[3]

On its cross appeal, the plaintiff claims that this court should replace our current punitive damages rule, which limits such damages to the expense of litigation less taxable costs, with a rule which would permit a measure of damages which would effectively deter and punish wanton, wilful and reckless conduct. The plaintiff also claims on its cross appeal that the trial court erred: (1) in not finding that the defendants' conversion of the storage tanks was a violation of CUTPA thus entitling the plaintiff to further punitive damages; (2) in refusing to accept evidence on the defendants' wealth and sales income as factors in measuring punitive damages; and (3) in failing to award punitive damages under CUTPA for the defendants' purchase of the realty on which the storage tanks at issue are located. The plaintiff also asks this court to award it additional counsel fees either under CUTPA or under our common law rule for the expenses incurred in this appeal.

I

The Canaan Oil Company, Inc., hereinafter Canaan Oil, was a wholly owned subsidiary of Canaan Fuel. The corporations, which were solely owned by Geoffrey S. Smith, Jr., operated a retail, commercial, and wholesale fuel oil and gasoline business in North Canaan. WPP operated a similar business in Waterbury and had become interested in extending its business to the North Canaan area. On August 14, 1975, a purchase and sale agreement was executed by both Smith, act-

---

[3] These motions deal with evidence allegedly discovered postjudgment by the defendants relating to the damages awarded by the trial court under the law of conversion and CUTPA. Because of our disposition of other issues raised by the parties on this appeal, we need not address the trial court's denial of these motions.

ing individually and as officer and director of both Canaan Fuel and Canaan Oil (sellers), and Ralph J. Devino, acting as the duly authorized vice president of WPP (buyer). The agreement provided that the sellers would "sell, assign, transfer and convey" to the buyer: (1) all customer accounts; (2) all accounts receivable; and (3) all rights, title and interest they have in or to "all Personal Property of said Sellers that pertain to the retail and commercial sale and delivery of fuel oil and gasoline, including trucks, tanks, pumps, parts inventory, and any customer loaned equipment."[4] WPP did not, however, negotiate or enter into any agreement concerning the purchase of the parcel of land owned by Canaan Fuel in North Canaan on which the business was conducted; rather, WPP used the premises to conduct its business pursuant to a use and occupancy agreement which had been negotiated with Smith.[5] Located on the premises are three 20,000 gallon storage tanks which Canaan Oil had used in conducting its business. These tanks rest by the force of gravity in cradles which in turn are cemented into the ground. These storage tanks had been placed on the property some years ago by Rodney Coombes, the previous owner of Canaan Oil and of the realty upon which the tanks are situated.

Sometime after the 1975 sale to WPP, Smith entered into negotiations regarding the sale of Canaan Fuel's North Canaan realty with Russell J. Riva, Jr., the president and "principal or sole owner" of Lindell, a corporation also engaged in the oil and gasoline business in the North Canaan area. Smith and Riva then made an oral agreement for the transfer of the real property. Smith, who resided in North Carolina at this time,

---

[4] The agreement provided that this sale was "[i]n consideration of Five Thousand Dollars ($5000.00) and other good and valuable considerations . . . ."

[5] There was evidence that when the purchase and sale agreement was executed, the land was encumbered by a number of liens and mortgages.

engaged Attorney Charles Rice to handle the transaction. Rice drew a quitclaim deed which described Canaan Oil & Fuel as the grantor and Lindell as the grantee. Smith executed the deed in behalf of Canaan Fuel in North Carolina and then returned it to Rice. The executed deed was then brought by Rice to the defendants' attorney, Hugh Robinson.

Initially, the terms of the agreement made by Smith and Riva included the payment of $1000 by Riva and Riva's obligation to secure releases of the encumbrances on the property except for a personal obligation which Smith owed to Atlantic Richfield. Upon presenting the deed to Robinson, however, Rice requested the payment of an additional $1000.[6] Robinson sent Rice to speak directly with Riva, who agreed to pay the additional $1000 and was then given the deed by Rice. Subsequently, Riva examined the deed and he realized that Lindell was the named grantee; Riva had previously notified his attorney, Robinson, that he (Riva) was to be the named grantee. Riva then informed Robinson of this problem, and Robinson then contacted Rice. Rice had no objection to making Riva the named grantee and he offered to draw a new deed conforming to Riva's request which would then be sent to Smith for execution. Robinson declined this offer because a delay of two weeks was contemplated. Robinson thereafter retyped the first page of the deed substituting Riva for Lindell as the named grantee.[7]

---

[6] There was evidence that Rice was authorized by Smith to do so since he was told by Smith "to work out the best possible deal he could and get as much of the debt that was owed by the Canaan Oil and Fuel Company and Canaan Oil Company to the mortgage holders and lien holders, paid off, as he could." The trial court found that this additional consideration was "probably to cover the cost of attorney fees."

[7] Riva later did obtain releases of the encumbrances on the property and he paid the $2000 consideration. This deed, with the retyped page naming Riva as the grantee, dated March 11, 1977, was recorded on April 12, 1977. The original deed having Lindell as the grantee, dated March 11, 1977, was

WPP was then informed by counsel for Riva and Lindell that Canaan Fuel had sold the realty to Lindell, that Lindell claimed the storage tanks as fixtures to the realty purchased, and that WPP would be locked out of the premises although it would have an opportunity to remove its inventory. As a result, WPP removed its inventory from the storage tanks and yielded possession of the property.

WPP then filed this action. WPP claimed the storage tanks as personal property, to which it had taken title as a result of the 1975 purchase and sale agreement with Smith described above, and sought injunctive relief and money damages for conversion. The trial court found that the storage tanks were not fixtures, but were personal property, and as such, title to them had passed to WPP pursuant to its 1975 purchase-sale agreement with Smith. It therefore found the defendants, because of their lockout of WPP, liable under the law of conversion with reference to the three storage tanks.[8] The court awarded consequential damages for the harm to WPP's business and common law punitive damages, the latter of which was limited in amount to the expense of litigation, less taxable costs.[9]

The defendants claim that the facts found by the trial court, when viewed in light of the applicable law, com-

recorded on July 6, 1977. A quitclaim deed naming Lindell as grantor and Riva as grantee of the property was executed and recorded on July 6, 1977.

[8] The court also found that the deed to the North Canaan realty under which the defendants claim title to the tanks was ineffective because: (1) at the time of the delivery to Riva of the deed from Canaan Fuel to Lindell, certain conditions upon which the transfer was predicated were not met; (2) in taking possession of the deed which named Lindell as grantee, Riva was acting on behalf of himself and not Lindell; and (3) the deed was materially altered by the substitution of Riva as grantee instead of Lindell.

[9] The court also issued a mandatory injunction ordering the defendants Lindell and Riva to return the storage tanks in issue, and a prohibitory injunction ordering those defendants to refrain "from exercising any control over the customer-loaned equipment and tanks [personalty] transferred to the plaintiff" under its August, 1975 agreement with Smith. As against

pel the conclusion that the storage tanks are fixtures. Specifically, they point to: the circumstance that the tanks were placed on the property by its owner for the use of his business; the ponderous nature of the storage tanks; the circumstance that these tanks rest on cradles which have footings cemented into the ground and that they are set on a part of the property that is specially raised to permit a gravity flow of the stored fuel; the fact that the tanks were transferred by Coombes in 1967 when he sold the land upon which they are located; their claim that prior to the sale of the property by Coombes, the municipal tax records of North Canaan included the three storage tanks in the description and assessment of the land; and their claim that Canaan Fuel considered the tanks to be fixtures when it purchased the property from Coombes and that it did not intend to sell these tanks to WPP in 1975 when it sold its personal property.

On the other hand, the plaintiff maintains that the trial court properly focused on: the "intent of the parties" regarding the sale by Canaan Fuel of its personal property to WPP; the evidence of the custom in the industry to treat such tanks as personalty; the evidence which indicated that Coombes listed these tanks as personalty on his personal property field sheets; Riva's efforts to rent the tanks from WPP; and the evidence that storage tanks are easily removable from the land. Moreover, the plaintiff claims that even if the tanks were originally considered fixtures by Coombes at the time of annexation, they were constructively severed by the subsequent agreements of the interested parties.

"To constitute a fixture, it is essential 'that an article should not only be annexed to the freehold, but that

the defendant Canaan Fuel, the court entered an injunction prohibiting it from selling the storage tanks "as fixtures of the premises it owned or still owns, as the case may be, if and when new documents have to be executed to effect the sale of said premises."

it should clearly appear from an inspection of the property itself, taking into consideration the character of the annexation, the nature and the adaptation of the article annexed to the uses and purposes to which [the realty] was appropriated at the time the annexation was made, and the relation of the party making it to the property in question, that a permanent accession to the freehold was intended to be made by the annexation of the article.' *Capen* v. *Peckham,* 35 Conn. 88, 94 [1868]; *Merritt-Chapman & Scott Corporation* v. *Mauro,* 171 Conn. 177, 182, 368 A.2d 44 [1976]; *Giuliano Construction Co.* v. *Simmons,* 147 Conn. 441, 443, 162 A.2d 511 [1960]; *Tolles* v. *Winton,* 63 Conn. 440, 28 A. 542 [1893]; *Barnes* v. *Burt,* 38 Conn. 541 [1871]; *Alvord Carriage Mfg. Co.* v. *Gleason,* 36 Conn. 86 [1869]." *Norwalk Vault Co. of Bridgeport, Inc.* v. *Mountain Grove Cemetery Assn.,* 180 Conn. 680, 686–87, 433 A.2d 979 (1980).

As is clear from our recent cases, our test focuses on the objectively manifested intent of the annexer. *Merritt-Chapman & Scott Corporation* v. *Mauro,* 171 Conn. 177, 182, 368 A.2d 44 (1976); *Cleaveland* v. *Gabriel,* 149 Conn. 388, 391–92, 180 A.2d 749 (1962); *Giuliano Construction Co.* v. *Simmons,* 147 Conn. 441, 443, 162 A.2d 511 (1960). "Ordinarily, if not invariably, the character of personal property attached to realty is to be determined as of the date when the property is attached. *Giuliano Construction Co.* v. *Simmons,* [supra]; *Lesser* v. *Bridgeport-City Trust Co.,* 124 Conn. 59, 63, 198 A. 252 [1938]." *Cleaveland* v. *Gabriel,* supra. "The intent sought is not the subjective intent or undisclosed purpose of the annexer, but the intent manifested by his actions." *Giuliano Construction Co.* v. *Simmons,* supra. See also, 1 Thompson, Real Property (1980 Replacement) § 59. We have previously indicated that the narrow " 'question of intent is a question of fact, the determination of .which is not reviewable

unless the conclusion drawn by the trier is one which cannot reasonably be reached.' *International Brotherhood* v. *Commission on Civil Rights,* 140 Conn. 537, 543, 102 A.2d 366 [1953]; *McDermott* v. *McDermott,* 97 Conn. 31, 35, 115 A. 638 [1921]." *Merritt-Chapman & Scott Corporation* v. *Mauro,* supra, 186.

At this point, we note that our review of the trial court's decision is limited to whether it was clearly erroneous. "This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980). It is not our function to retry cases. *New Haven Savings Bank* v. *West Haven Sound Development,* 190 Conn. 60, 70, 459 A.2d 999 (1983).

We conclude that the trial court's memorandum of decision adequately supports its conclusion that the tanks are personalty. The trial court found that Coombes, who had placed the tanks upon the realty which he then owned, had listed the tanks on the personal property field sheets of Canaan Oil; that the tanks rest only by the force of gravity and were "free of" and "unattached to the realty"; that such tanks were easily removed from one site to another with minimal time and modest expense;[10] that the tanks were "an indispensable element to the continued running of the

---

[10] At trial, James Collingwood testified that he had experience in removing and transporting tanks similar to those at issue and that it took a three-man crew thirty minutes to an hour and a half to remove a tank. Devino, vice president of WPP, testified that "[t]here's a feed line on each tank

*business* . . .'' which Coombes held before his transfer to Smith (emphasis added); and that the tanks were "not in any way adopted [sic] to some special or peculiar use of the land or vice versa."

The court's finding that Coombes listed the tanks on Canaan Oil's personal property field sheets[11] is a significant "objective manifestation" of his intent; see *Merritt-Chapman & Scott Corporation* v. *Mauro,* supra, 182, and cases cited; to treat the tanks as personalty. See, e.g., *Graham* v. *First National Bank of Dickinson,* 175 F. Sup. 81, 85 (D.N.D. 1959). The circumstances relating to the character of the annexation, that the tanks rest in place only by gravity and that such tanks are easily removable apparently without damage to the tanks or to the realty, although not dispositive, are part of the inquiry required by our cases and these circumstances can fairly be said to militate against an intent that a " 'permanent accession to the freehold was

but on these particular tanks there are two inch bungs and there is a vent line that runs off each tank. You take a three foot wrench and you try to unscrew the plug. If the nipple does not come out of the bung and the tank, you can wrap the elbow and crack it with a sledgehammer and that's all there is to it. Swing the pipe away and you lift the tanks right off the cradles. Nothing to it.''

[11] The defendants assert that the trial court misinterpreted the evidence concerning the taxing of the storage tanks. They point to tax records from the North Canaan tax assessor's office which describe the realty as "200' x 165' plus Oil Tanks." The defendants maintain that the personal property field sheets completed by Coombes for Canaan Oil which list "pumps" and "tanks" as personalty could not relate to the tanks in question, but to smaller tanks and pumps which were loaned by Canaan Oil to its customers.

As we stated above, it is not our province to retry facts. *New Haven Savings Bank* v. *West Haven Sound Development,* 190 Conn. 60, 70, 459 A.2d 999 (1983); *Gallo* v. *Gallo,* 184 Conn. 36, 38, 440 A.2d 782 (1981). It is the function of the trier of fact to evaluate conflicting evidence and it is only in those circumstances where no other result could reasonably be reached that we will disturb the results of that evaluation process. *Steinman* v. *Maier,* 179 Conn. 574, 576, 427 A.2d 828 (1980); *United Construction Corporation* v. *Beacon Construction Co.,* 147 Conn. 492, 495, 162 A.2d 707 (1960). We will not disturb the trial court's finding in this regard.

intended.' " *Norwalk Vault Co. of Bridgeport, Inc.* v. *Mountain Grove Cemetery Assn.,* supra. Further, the trial court's finding that the tanks were not specially adapted to some special or peculiar use of the land, when viewed in light of the trial court's concomitant finding that the tanks were an "indispensable element" to the business, i.e., Canaan Oil, is also consistent with the trial court's conclusion that the tanks are personalty. Indeed, although the defendants maintain that the tanks were transferred from Coombes to Smith by the warranty deed[12] for the North Canaan realty, the trial court did not make such a finding; rather, it found that the three storage tanks "were part of that business so purchased" by Smith. In view of the indispensable nature of the tanks to that business and Coombes' listing of the tanks as personalty on Canaan Oil's personal property field sheets, the trial court could fairly conclude that Coombes transferred the tanks as personalty to Smith. Thus, the facts found by the trial court adequately support the conclusion that Coombes did not, as the defendants claim he did, intend the tanks to become permanent accessions to the realty.

Moreover, additional facts found by the trial court further established that the storage tanks had been treated as personalty by the parties. The trial court found that the 1975 sale by Smith, acting individually and as an officer of Canaan Fuel and Canaan Oil, of all customer accounts, accounts receivable, and the "Personal Property of [the] Sellers that pertain to the retail and commercial sale and delivery of fuel oil and gasoline, including trucks, tanks, pumps, parts inventory, and any customer loaned equipment," clearly indicated the purchase of an on-going business part of

---

[12] The warranty deed for the transfer of the North Canaan realty from Coombes, who had apparently held the land personally and not in the corporate name, to Smith acting on behalf of Canaan Oil, which business Coombes had transferred to him, conveyed the subject realty "with all of the buildings . . . and appurtenances thereto . . . ."

which consisted of the storage tanks here at issue which were an indispensable element to that business.[13] The trial court also found that the defendant Riva had contacted the plaintiff in an attempt to rent the tanks prior to the 1977 transfer of the underlying realty by Smith to the defendants. In view of this circumstance, it follows that the defendants were aware of the character of the storage tanks as personalty prior to entering into their transaction with Smith and, therefore, they cannot claim title to the storage tanks as fixtures under the deed through which they now claim title to the realty. See *Landon* v. *Platt*, 34 Conn. 517, 521–25 (1868); see generally, 1 Thompson, Real Property (1980 Replacement) § 75. "Certainly, these are among the facts to be considered in determining '[w]hether a permanent accession to the freehold was intended.' *Giuliano Construction Co.* v. *Simmons*, supra." *Cleaveland* v. *Gabriel*, supra, 393. We therefore conclude that the trial court correctly found the storage tanks to be personalty, and as such, they are owned by the plaintiff.

## II

We now turn to the defendants' claims of error regarding the damages awarded by the trial court. After determining that the storage tanks were the personal property of the plaintiff, the trial court found that the defendants' "lockout" of the plaintiff constituted an act of conversion. It found that the plaintiff had "proximately sustained" damages in the amount of $40,000 relative to its efforts to maintain its oil business and for its loss of gasoline business after the lock-

[13] We note that there was evidence, as pointed out above, that in addition to the storage tanks at issue, Canaan Oil also owned other tanks which were loaned to customers. The circumstance that the 1975 purchase and sale agreement between Smith and the plaintiff delineated the personal property to be transferred as including "tanks, pumps . . . and any customer loaned equipment" supports the trial court's finding that Smith transferred the storage tanks at issue, which clearly are not "customer loaned equipment," to the plaintiff pursuant to that agreement.

out.[14] In addition to these consequential damages, the trial court also found that the defendants had committed an unfair trade practice under CUTPA and awarded damages therefor in the total amount of $15,000.[15]

---

[14] The damages were apportioned as follows: (1) loss of gasoline business—$23,750; (2) purchase of trailer tank—$4500; (3) refitting smaller trucks—$375; (4) overtime for one person—$3500; (5) taxes on trucks not available for use—$986; (6) truck wear and tear and mileage—$7000.

In reaching the damage amounts, the trial court stated that "the duty on the part of the plaintiff to reduce or mitigate losses must be considered." Accordingly, it noted that the defendants' act of conversion "merely prevented the plaintiff from moving and then using the storage tanks . . . [but] did not prevent it from purchasing new or used storage tanks, as economic considerations dictated, and placing same at [its] new location." Devino testified that he was advised by his attorney not to purchase replacement tanks. Thus, although the plaintiff claimed damages from the date of conversion to the date of trial, a period of almost four years, the trial court concluded that such claim was "neither reasonable nor equitable" and it found that "a period of one year is an equitable period of time within which the plaintiff could and should have relocated and set up its business in the area without recourse to the extraordinary procedures used in keeping the business operating in the Canaan area."

The trial court also found that the defendants were liable to the plaintiff for the use of the tanks from the date of the conversion but it left the amount of such damages to be determined at a subsequent evidentiary hearing. After that subsequent hearing, the trial court awarded the plaintiff damages in the sum of three hundred dollars per month for the use of the tanks from April 1, 1977, to August 15, 1981, less an offset of two thousand five hundred dollars for improvements made on the tanks by the defendants. On appeal, the defendants assert that this damage award for the use of the tanks was rendered by the court, sua sponte, since the plaintiff never requested such damages. We point out that while it appears that the court acted sua sponte in its initial memorandum of decision in finding the defendants liable for the use of the tanks, counsel for the defendants made no objection to the trial court's action when the subsequent evidentiary hearing was held at which time he had a clear opportunity to do so. The defendants are represented by the same counsel on this appeal as at the subsequent evidentiary hearing, and it is on this appeal that this objection is raised for the first time. Therefore, we do not consider the defendants' claim on the damages awarded for the defendants' use of the tanks. See Practice Book § 3063; *Mazur* v. *Blum*, 184 Conn. 116, 120, 441 A.2d 65 (1981).

[15] In its initial memorandum of decision the trial court awarded $5000 in CUTPA damages, stating: "Once the plaintiff lost the use of the bulk storage tanks by reason of the defendants' act of conversion, the defend-

## A

Regarding the trial court's award of consequential damages, the defendants first claim that the proper measure of damages in this case was limited to the value of the tanks at the date of the conversion. They argue that this measure of damages represents the general rule of damages to be awarded in conversion and that it is only where the replacement value of an article is not ascertainable that a different measure may be used. They further assert that even if the plaintiff would be entitled to damages beyond the value of the tanks, those damages are special damages and, since the plaintiff did not plead special damages, it cannot recover them in this case. The defendants also assert that the damages awarded were based upon the bald claims of one witness and were wholly undocumented and uncorroborated.

In *Giuliano Construction Co.* v. *Simmons,* supra, 444, we referred to our rule concerning the measure of damages in conversion as stated in *Kuzemka* v. *Gregory,* 109 Conn. 117, 146 A. 17 (1929), where we stated: "The authoritative general rule recognized in numerous decisions in this State is that the measure of damages in [conversion] is the value of the goods at the date of the conversion." Id., 122. It is quite clear, however, that this formula is not exclusive of other methods of calculating damages in conversion. For example, in *Kuzemka,* it was stated that if the property converted "does not . . . have a market value, or in the case of goods having a special and peculiar value to the

---

ants aggressively campaigned among the customers of the plaintiff, with the intent to procure [its] oil business, by passing the word that the plaintiff was leaving the area. The plaintiff was then impelled to wage an advertising campaign to nullify that, at considerable cost to itself. That act on the part of the defendants was an unfair trade practice under the statute."

In its supplemental memorandum of decision it also awarded punitive damages under CUTPA in the amount of $10,000.

owner, then full compensation requires that [the rightful owner] recover 'the value to him based on his actual money loss, all the circumstances and conditions considered, resulting from his being deprived of the property . . . .' " Id. Likewise, it appears to be well accepted in the majority of jurisdictions that consequential damages are recoverable in a conversion action. See, e.g., *Colorado Kenworth Corporation* v. *Whitworth,* 357 P.2d 626, 631–32 (Colo. 1960); *Bader* v. *Cerri,* 609 P.2d 314, 316–18 (Nev. 1980); *Preble* v. *Hanna,* 117 Or. 306, 317, 244 P. 75 (1926); see generally, 18 Am. Jur. 2d, Conversion §§ 95–99; 89 C.J.S., Trover and Conversion § 170.

The storage tanks converted by the defendants in this case were "an indispensable element" to the plaintiff's business and the eventual return of the tanks to the plaintiff or a reimbursement to it of their value as of the date of the conversion would not "give full money compensation to the plaintiff for the loss [it] has suffered by the conversion . . . ." *Kuzemka* v. *Gregory,* supra; see *Youngset, Inc.* v. *Five City Plaza, Inc.,* 156 Conn. 22, 237 A.2d 366 (1968). Consequential damages are recoverable in circumstances such as those present in this case.[16]

---

[16] We note at this point, as the defendants maintain, that consequential damages in a conversion action are special damages since although they result from "the *natural* consequences of the act complained of, [they] are not the necessary result of it . . . ." *Cordner* v. *Hall,* 84 Conn. 117, 120, 79 A. 55 (1911); see *Varley* v. *Motyl,* 139 Conn. 128, 134, 90 A.2d 869 (1952); *Smith & Egge Mfg. Co.* v. *Webster,* 87 Conn. 74, 81–82, 86 A. 763 (1913); *Mathews* v. *Livingston,* 86 Conn. 263, 270–71, 85 A. 529 (1912). As the defendants point out, our cases concerning an award of special damages, like those given in this case, essentially require that "in order to prevent a surprise upon the defendant, [special damages] must be particularly specified in the declaration, or the plaintiff will not be permitted to give evidence of them at trial." *Cordner* v. *Hall,* supra. Whether a complaint gives sufficient notice is determined in each case with reference to the character of the wrong complained of and the underlying purpose of the rule which

We find merit, however, to the defendants' claim that the consequential damages actually awarded to the plaintiff are not supported by the evidence. At trial, the sole evidence concerning the consequential damages awarded by the court consisted of the testimony of Devino, the plaintiff's vice president.[17] He testified that as a result of the conversion of the tanks the plaintiff found it necessary to purchase a new tank trailer in order to provide service which "cost . . . eighteen —about nineteen thousand dollars overall, eighteen thousand five or eighteen thousand seven hundred dollars." He also testified that three trucks were rerigged at about "fifteen hundred dollars total, almost six hundred dollars per truck." Further, he stated that the plaintiff incurred "a tremendous amount of overtime" which cost the plaintiff $4000 per year for four years.[18]

is to prevent surprise upon the defendant. *Smith & Egge Mfg. Co.* v. *Webster,* supra, 83–84.

It is clear from the record before us that neither the plaintiff's initial complaint nor its amended complaint contained an appropriate "special allegation." *Varley* v. *Motyl,* supra. This "failure to plead," according to the defendants, precludes the trial court's award of consequential damages. This claim raises the issue of a variance between the plaintiff's pleading and proof since evidence of the special damages at issue was offered at trial.

The proper way to attack a variance between pleadings and proof is by objection at the trial to the admissibility of that evidence which varies from the pleadings, and failure to do so at the trial constitutes a waiver of any objection to such variance. *Bronson & Townsend Co.* v. *Battistoni,* 167 Conn. 321, 326, 355 A.2d 299 (1974); *Acampora* v. *Ledewitz,* 159 Conn. 377, 380, 269 A.2d 288 (1970). Our review of the record before us reveals that no proper objection was made at trial by the defendants to the evidence offered by the plaintiff relating to the special (consequential) damages it claimed. Therefore, the plaintiff is not precluded from a recovery of such damages because of a variance between its pleadings and proof.

[17] We note that in two of its briefs before us, the defendants have asserted that Devino's testimony was the only evidence offered at trial relating to proof of the amount of the consequential damages awarded by the trial court. The plaintiff has not pointed us to, nor have we found in the record before us, anything contrary to the defendants' claim. In its brief, the plaintiff refers only to what it claims to be "a substantial amount of testimony [by Devino] on these damage claims."

[18] Regarding this testimony, counsel for the defendants objected stating

Devino also stated that the cost of wear and tear on the plaintiff's trucks as a result of the conversion of the tanks was "around twenty thousand dollars over [a] four year period."[19]

In addition, Devino testified that the plaintiff "totally" lost its gasoline business in the North Canaan area. His testimony as to the value of that business was that "[a]t the time the average mark up per gallon of gasoline commercially was around ten cents a gallon. We had approximately a hundred and thirty thousand gallons worth of business in the area. So, if that company was to be sold, it would be bought for the average mark up in the industry which at the time was ten cents a gallon . . . [t]imes a hundred and thirty thousand gallons. It's a hundred and thirty thousand—it's around a hundred thousand dollars, ninety-one thousand and something, the figure. That's what the business was worth."

An examination of this evidence in light of the damages awarded by the trial court demonstrates that the dollar amounts actually awarded to the plaintiff for each item of damage claimed find no reasonable support in the evidence or reasonable relation to the formula explicitly adopted by the trial court in considering the plaintiff's duty to "mitigate" its loss. Under this mitigation formula, it is apparent from its express statement in the memorandum of decision that the trial court intended to award an amount which corresponded

that this evidence was "too speculative" and that this was "not the proper way to prove damages . . . . I'm sure he's got . . . time cards to prove [this] and I think that's the proper way to prove damages . . . ." Although Devino stated at this point that he had "time cards," no such evidence was offered at trial.

[19] At this point in Devino's testimony the following colloquy took place:

"Mr. Stedronsky: Your Honor, again, I've got to object. It's incredibly speculative. I mean, he's pulling numbers out of his hat.

"The Court: Well, he's in the business, he's doing it. Now, if you want to tear that apart to show that it's worth nothing, you can do that on cross-examination. That's his opinion, he's lost twenty thousand dollars."

to one fourth of the amount of damages claimed by the plaintiffs and found by the court to have been proved by the plaintiff.[20] It is clear from the dollar amounts actually awarded for the various items of damage,[21] that the plaintiff received at least one award which was considerably in excess of one fourth of the amount to which Devino had testified and that, in other instances, its actual dollar award was less than one fourth of that amount stated in Devino's testimony, the sole evidence offered on these damages.[22] For example, the only evidence at trial relating to the claim for damages for truck wear and tear was that such wear and tear "convert[ed] . . . into dollars and cents . . . [was] around

[20] As noted previously, although the plaintiff claimed damages predicated on a time period of about four years, the trial court determined that damages based upon a time period of one year was "equitable." See footnote 14, supra.

[21] See footnote 13, supra.

[22] We recognize that there can be circumstances where proof of damages may be difficult and that such difficulty is, in itself, an insufficient reason for refusing an award once the right to damages has been established. *Griffin* v. *Nationwide Moving & Storage Co.,* 187 Conn. 405, 420, 446 A.2d 799 (1982); see *Kay Petroleum Corporation* v. *Piergrossi,* 137 Conn. 620, 625, 79 A.2d 829 (1951); *Ball* v. *Pardy Construction Co.,* 108 Conn. 549, 551, 143 A. 855 (1928). "Nevertheless, the 'court must have evidence by which it can calculate the damages, which is not merely subjective or speculative, but which allows for some objective ascertainment of the amount.' *Bronson & Townsend Co.* v. *Battistoni,* 167 Conn. 321, 326–27, 355 A.2d 299 (1974)." *Griffin* v. *Nationwide Moving & Storage Co.,* supra. This certainly does not mean that "mathematical exactitude" is a precondition to an award of damages, but we do require " 'that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation which will enable the trier to make a fair and reasonable estimate.' *Ball* v. *T. J. Pardy Construction Co.,* [supra]." *Hedderman* v. *Robert Hall of Waterbury, Inc.,* 145 Conn. 410, 414, 144 A.2d 60 (1958); *Griffin* v. *Nationwide Moving & Storage Co.,* supra, 423. A plaintiff "will not be denied a substantial recovery if [he has] produced the best evidence available and it is sufficient to afford a reasonable basis for estimating [his] loss." *Grant* v. *West Haven Gardens Co.,* 181 Conn. 379, 387, 435 A.2d 970 (1980), quoting *Johnson* v. *Flammia,* 169 Conn. 491, 500–501, 363 A.2d 1048 (1975). As stated above, the sole evidence offered to prove these damages was the testimony of Devino. There was no other evidence offered, documentary or corroborative.

$20,000 over [a] four year period." Yet, the trial court awarded $7000 despite its "mitigation formula."[23] Further, regarding the largest of the itemized awards of consequential damage, i.e., the plaintiff's loss of its gasoline business, the trial court awarded $23,750. The only evidence offered to prove the amount of damage sustained was Devino's testimony that if the plaintiff company "was to be sold, it would be bought for the average mark up in the industry which at the time was ten cents a gallon. . . . Times a hundred and thirty thousand gallons. It's a hundred and thirty thousand—it's around a hundred thousand dollars, ninety-one thousand and something, the figure. That's what the business was worth." First, we take note of the obvious mathematical defect evident in Devino's testimony which, as the only evidence before the court on that item of damage, discloses a significant uncertainty regarding the actual value of the business lost and provides an inadequate basis for the $23,750 actually awarded. Moreover, even were we to accept the dollar values as stated by Devino in his testimony, the trial court's award of $23,750 for the loss of the gasoline business bears no reasonable relation to those dollar values when viewed in light of that court's "mitigation" formula.[24] Thus, while it is quite clear that the trial court credited Devino's testimony regarding the consequential damages as was its province; *Willametz* v. *Goldfeld,* 171 Conn. 622, 624, 370 A.2d 1089 (1976); for reasons not stated by the court, it rendered damage awards which find no reasonable support in the evi-

[23] Devino testified that the damage sustained in the purchase of a new trailer tank was $18,500–$19,000, and that overtime expenses in the amount of at least $4000 per year were incurred. The trial court awarded damages in the amount of $4500 and $3500, respectively.

[24] We note that in their brief, the defendants have specifically pointed out this "particularly puzzling" testimony of Devino in support of their claim that the damages awarded by the court were unsupported by the evidence. The plaintiff has offered us no explanation to contradict the defendants' claim and we find none in the record before us.

dence or reasonable relation to the formula explicitly adopted by the trial court. Therefore, these damages cannot stand and the case must be remanded for a new trial on the issue of consequential damages. See *Gordon v. Indusco Management Corporation,* 164 Conn. 262, 273–76, 320 A.2d 811 (1973); *Goldberg v. Mertz,* 123 Conn. 308, 310, 194 A. 721 (1937); 5A C.J.S., Appeal & Error § 1659.

B

We now turn to the trial court's awards of damages under CUTPA.[25] The defendants claim that the CUTPA damages awarded were based on erroneous information, and further, that CUTPA is not applicable to their acts. Specifically, regarding their latter claim, the defendants argue that CUTPA, as in effect in 1977 (the time of the alleged unfair trade practices in this case), did not authorize the plaintiff to bring an action under its private remedy provision.[26] The plaintiff, on the other hand, maintains that CUTPA is applicable to this case because the 1979 amendments[27] to CUTPA should be given retroactive effect or because, in the alternative, the plaintiff had a private right of action against the defendants under CUTPA's 1977 provisions. The attorney general, as amicus curiae, similarly maintains

---

[25] See footnote 15, supra.

[26] We note that in its brief the plaintiff has asserted that the defendants did not raise this claim in the trial court and that they have not referred to any trial brief or oral argument where this claim was raised. The defendants have, however, asserted that the claim was made in their supplemental trial brief dated March 11, 1981. The plaintiff has not responded further on this claim of waiver either in a brief or at oral argument. We will address this claim.

[27] There appears to be no dispute that under CUTPA's current private right of action provision, the plaintiff would be authorized to bring a private action. The current statute, as amended in 1979; Public Acts 1979, No. 79-210, § 1; authorizes a private action for "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b . . . ." General Statutes (Rev. to 1983) § 42-110g (a).

that CUTPA, as in effect in 1977, provided the plaintiff with a private right of action since the subsequent amendment to the private remedy provision in 1979 served only to clarify the statute as it existed after the 1975 amendments. We hold that the plaintiff does not have a right to a private action under CUTPA for the defendants' alleged unfair trade practices.

Enacted by the legislature in 1973, CUTPA was originally intended to be Connecticut's counterpart to the Federal Trade Commission Act, hereinafter FTCA. It provided then as it does today, that "[no] person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[28]

As enacted in 1973, CUTPA authorized private actions by "[a]ny person who purchases or leases goods or services from a seller or lessor primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by such seller or lessor of a method, act or practice prohibited by section 42-110b . . . ."[29] There appears to be no dispute that under the language of the original 1973 private remedy provision, two limitations existed. First, the plaintiff must have been a purchaser or lessee of goods or services for personal, family or household purposes; second, the defendant must have been the seller or lessor who had sold or leased the goods or services to the plaintiff. Hence, as originally enacted, CUTPA required "privity" between the plaintiff and the defendant in private actions.

[28] Public Acts 1973, No. 73-615, § 2; General Statutes (Rev. to 1975) § 42-110b; General Statutes (Rev. to 1983) § 42-110b (a).

[29] General Statutes (Rev. to 1975) § 42-110g (a) (current version, as amended, General Statutes [Rev. to 1983] § 42-110g [a]).

CUTPA's private remedy provision was amended in 1975.[30] In doing so, the legislature inserted the amending language so as to precede the original language of the 1973 statute. Thus, after the adoption of the 1975 amendment, CUTPA authorized a private right of action for "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by such seller or lessor of a method, act or practice prohibited by section 42-110b, or any person who purchases or leases goods or services from a seller or lessor primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by such seller or lessor of a method, act or practice prohibited by section 42-110b . . . ."[31] It is this statutory provision that was in effect at the time of the alleged CUTPA violations in this case.[32] There would appear to be no dispute that the language of the 1975 amendment broadened CUTPA's private remedy provision to eliminate the first of the two limitations contained in the original 1973 provision, i.e., that the plaintiff be a purchaser or lessee of goods or services for personal, family or household purposes. It is less than clear, however, from the text of the statute as amended in 1975 whether the second limitation contained in the 1973 statute, i.e., the "privity" requirement, was also eliminated in 1975. The ambiguity involved here arises from the circumstances that the amending language in 1975, which was inserted so as to precede the full text of the original 1973 statute, refers to "[a]ny person" without the express requirement contained in the 1973 statute that such person be one who "purchases or leases goods or services from a seller or lessor," but it did

---

[30] Public Acts 1975, No. 75-618, § 5.

[31] General Statutes (Rev. to 1977) § 42-110g (a).

[32] In 1979, this private remedy provision was further amended to its current form. See footnote 27, supra.

provide that the loss suffered by "[a]ny person" must result from the use or employment of a prohibited practice "by such seller or lessor." The "such seller or lessor" language in the 1975 amendment, however, had no antecedent in the statute, thus creating an ambiguity as to its intended referent. Moreover, it would also seem apparent that the language added by the 1975 amendment, in not making the right to a private action turn on the purpose for which the plaintiff purchased or leased goods or services, subsumed the limiting language of the original 1973 statute.

A cardinal rule of statutory construction is to construe statutes in a manner which gives effect to the apparent intention of the legislature. *Robinson* v. *Unemployment Security Board of Review,* 181 Conn. 1, 6, 434 A.2d 293 (1980). "It has often been said that the legislative intent is to be found not in what the legislature meant to say, but in the meaning of what it did say. *Wiegand* v. *Heffernan,* 170 Conn. 567, 581, 368 A.2d 103 (1976); *Colli* v. *Real Estate Commission,* 169 Conn. 445, 452, 364 A.2d 167 (1975); *Sillman* v. *Sillman,* 168 Conn. 144, 148, 358 A.2d 150 (1975)." *Muha* v. *United Oil Co.,* 180 Conn. 720, 730, 433 A.2d 1009 (1980). Where the language used is clear and unambiguous, we will not speculate as to some supposed intention. *Robinson* v. *Unemployment Security Board of Review,* supra. Where there is an ambiguity in the language used in a statute, however, we construe that statute in light of its legislative history, its language, the purpose it is meant to serve and the circumstances surrounding its enactment. *Robinson* v. *Unemployment Security Board of Review,* supra, 8, citing *Board of Education* v. *Connecticut State Board of Education,* 179 Conn. 694, 700 n.3, 427 A.2d 846 (1980); *Schwarzschild* v. *Binsse,* 170 Conn. 212, 216, 365 A.2d 1195 (1976). Further, in construing statutes, we presume that there is a purpose behind every sentence,

clause, or phrase used in an act and that no part of a statute is superfluous. *State* v. *Grant,* 176 Conn. 17, 20, 404 A.2d 873 (1978); *Catino* v. *Board of Education,* 174 Conn. 414, 418, 389 A.2d 754 (1978).

The legislative history accompanying the passage of the 1975 amendment provides no insight whatsoever which would assist us in interpreting the intent of that amendment. The plaintiff and the amicus maintain, however, that an examination of the legislative history accompanying the 1979 amendment reveals that this amendment was not intended to make a substantive change in CUTPA's private remedy provision. In support of this claim, it is pointed out to us that the 1979 amendment was considered in the House of Representatives to be "purely a housecleaning bill and . . . basically a series of technical amendments to the existing Unfair Trade Practices Act . . . ." 22 H.R. Proc., Pt. 10, 1979 Sess., pp. 3338–39 (remarks by Rep. Robert F. Frankel). The legal and practical effect of this argument is that the 1979 amendment should be given retroactive effect. See, e.g., *Muha* v. *United Oil Co.,* supra, 729.

In this regard, we point out that in construing legislative enactments, we presume that amendments to a statute effect a change in the existing law. *Heffernan* v. *Slapin,* 182 Conn. 40, 49, 438 A.2d 1 (1980); *Robinson* v. *Unemployment Security Board of Review,* supra, 21 n.6. Further, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous. *State* v. *Grant,* supra, 20; *Catino* v. *Board of Education,* supra, 418. It is quite clear that the right at the core of this dispute is substantive in nature. When substantive rights are affected by an amendment, we must give the amendment prospective application only; *Heffernan* v. *Slapin,* supra, 51; "unless it clearly and unequivocally appears" that it was the legislative intent that the amendment

be given retroactive effect. *Hunter* v. *Hunter,* 177 Conn. 327, 331, 416 A.2d 1201 (1979). We reiterate that "we have consistently expressed our reluctance to give such statutes retroactive application. *East Village Associates, Inc.* v. *Monroe,* 173 Conn. 328, 332, 377 A.2d 1092 (1977)." *Sherry H.* v. *Probate Court,* 177 Conn. 93, 100, 411 A.2d 931 (1979).

We are not persuaded that the above statement from the House proceedings, upon which the plaintiff and the amicus rely, provides us with the requisite "clear and unequivocal" indication of legislative intent that the 1979 amendment be given retroactive effect. There is only a mere reference to the nature of the 1979 amendment as being a matter of housecleaning and technical in nature. Whether the amendatory act was to operate retroactively was not in any way discussed in the House proceedings. See, e.g., *Hunter* v. *Hunter,* supra. Moreover, it is significant that in addressing the 1979 amendment, the Senate proceedings do not reveal a characterization of that amendment similar to that made in the House. In fact, during the Senate proceedings it was stated: "The bill in general would promote greater cooperation between public and private efforts to enforce the uniform trade practices act. The Attorney General's office is hampered in this enforcement effort by [a] limited staff. Private litigation under this act is essential and the proposal would ease the burden on private individuals and thus encourage private litigation." 22 S. Proc., Pt. 8, 1979 Sess., p. 2575 (remarks of Sen. Steven C. Casey).

In light of the foregoing, we conclude that the 1975 amendment to CUTPA's private remedy provision was not intended to eliminate the "privity requirement" contained in the original 1973 provision. The 1975 amendment maintained the reference to "such seller or lessor" contained in the original 1973 statute, and although that phrase had no antecedent in the 1975

statute, it must be given some meaning. *State* v. *Grant,* supra; *Catino* v. *Board of Education,* supra. The logical conclusion we must reach on the basis of an examination of the sequence of the amendments, including the substantive nature of the 1979 amendment, which we have determined to be not retroactive, is that the reference to "such seller or lessor" contained in the 1975 amendment maintained the privity requirement of the original 1973 act, i.e., that the plaintiff was required to be a purchaser or lessee from the seller or lessor against whom the action was brought. No such privity exists in this case and, therefore, the plaintiff cannot bring a private action under CUTPA for the alleged unfair trade practices of the defendants.[33] Thus, the plaintiff was not entitled to recover damages under CUTPA for the activities of these defendants, and all the CUTPA damages awarded by the trial court must be vacated.

## C

We now turn to the trial court's award of common law punitive damages which were limited in amount to the plaintiff's expense of litigation less taxable costs. The defendants claim that the plaintiff is prevented from recovering punitive damages because it did not properly plead such damages and further, that the defendants' claimed good faith reliance on counsel precludes such an award. On its cross appeal, the plaintiff claims that although the trial court correctly found a basis for awarding punitive damages, it should not have limited such damages to the expense of litigation

---

[33] The plaintiff has asserted in its brief that, even under the interpretation which we now give to CUTPA's private remedy provision under the 1975 amendment, it has a private action against the defendant because Lindell, in entering the premises and ejecting the plaintiff, "arrogated to itself power as . . . lessor." This claim, which is not more than a bare assertion, is without merit. There is no indication in the record that the trial court was ever presented with a claim of this nature, it made no finding in this regard, and the record before us does not provide a basis for us to conclude that Lindell acted as a lessor as that term is used in CUTPA's private remedy provision.

less taxable costs. Rather, the plaintiff maintains that we should abandon our "archaic" common law rule and it invites us to join the majority of jurisdictions which permit an amount of "punitive" damages which serves to "punish and deter" wrongdoers who act wantonly and recklessly.[34] While we conclude that the trial court correctly awarded punitive damages, we decline the plaintiff's invitation to change our rule which limits such damages.[35]

---

[34] We note at this point that because of our disposition of this case, we need not reach the plaintiff's claim on its cross appeal that we should increase its award of attorney's fees to cover the costs incurred in defending this appeal.

[35] We reject the defendants' claim that the trial court should not have awarded any punitive damages. First, the defendants contend that the plaintiff may not recover on this claim as there is a variance between the pleadings and proof. They assert that the plaintiff is not entitled to such damages in that it did not allege wanton or malicious conduct in its complaint. In support of their argument, the defendants cite *Killian* v. *Bolster*, 96 Conn. 693, 694, 115 A. 469 (1921), where the court found no error in the trial court's refusal to award exemplary damages where "the plaintiff did not allege in his complaint any wanton or malicious conduct of the defendant . . . ." Further, the *Killian* court found that no facts could have been found to support such a claim. The defendants in this case also assert that the plaintiff sought punitive damages only under CUTPA at trial.

The plaintiff's amended complaint shows that it sought damages, treble damages, punitive damages and reasonable attorney's fees for the defendants' alleged acts of conversion and unfair trade practices. We have in the past indicated that we consider it fundamental that a plaintiff's right to recovery is measured by the allegations in his complaint. *Bronson & Townsend Co.* v. *Battistoni*, 167 Conn. 321, 326–27, 355 A.2d 299 (1974); *Lundberg* v. *Kovacs*, 172 Conn. 229, 232, 374 A.2d 201 (1977). We have also stated, however, that our courts now follow a more liberal policy in passing on claims of variance. Id., 233. In claiming a variance, it is essential to raise such a claim during trial. *Acampora* v. *Ledewitz*, 159 Conn. 377, 380, 269 A.2d 288 (1970). The defendants point to no part of the record before us where they raised the issue of variance before the trial court. Therefore, they cannot claim variance on this appeal.

Second, the defendants' claim that they acted on their good faith reliance on counsel is no more than a bare assertion implicitly rejected by the trial court which expressly found a reckless disregard on the part of the defendant Riva for the harm which his actions would cause to the plaintiff. This finding, which the trial court could reasonably make from the evidence before it, provides a sufficient basis for a punitive damage award. *Vandersluis* v. *Weil*, 176 Conn. 353, 358, 407 A.2d 982 (1978); *Collens* v. *New Canaan Water Co.*, 155 Conn. 477, 489, 234 A.2d 825 (1967).

Long ago, in *Hanna* v. *Sweeney,* 78 Conn. 492, 62 A. 785 (1906), this court set forth the rule which we have since followed regarding the appropriate measure of common law punitive damages. In limiting our measure to the expense of litigation less taxable costs, the court noted that under the typical common law rule the jury was permitted to exercise a virtually unchecked discretion to award damages not only to make the injured person whole, but to punish the wrongdoer. Id., 493–94. The court further recognized that the doctrine of punitive damages which permits recovery beyond compensation prevailed in most jurisdictions, but, nonetheless, it refused to adopt such a rule characterizing it as a " 'hybrid between a display of ethical indignation and the imposition of a criminal fine.' " Id., 494, quoting *Haines* v. *Schultz,* 50 N.J.L. 481, 484 (1888). Thus, such a rule was found to be at a variance with the generally accepted rule of compensation in civil cases. Id.; see *Doroszka* v. *Lavine,* 111 Conn. 575, 578, 150 A. 692 (1930) (our purpose in assessing damages for civil wrongs is to compensate the plaintiff for his injuries). Since *Hanna,* we have consistently adhered to this view. See, e.g., *Alaimo* v. *Royer,* 188 Conn. 36, 42, 448 A.2d 207 (1982); *CEUI* v. *CSEA,* 183 Conn. 235, 251, 439 A.2d 321 (1981); *Kelsey* v. *Connecticut State Employees Assn.,* 179 Conn. 606, 615, 427 A.2d 420 (1980); *Vandersluis* v. *Weil,* 176 Conn. 353, 358, 407 A.2d 982 (1978); *United Aircraft Corporation* v. *International Assn. of Machinists,* 161 Conn. 79, 106, 285 A.2d 330 (1971), cert. denied, 404 U.S. 1016, 92 S. Ct. 675, 30 L. Ed. 2d 663 (1972); *Collens* v. *New Canaan Water Co.,* 155 Conn. 477, 488, 234 A.2d 825 (1967); *Triangle Sheet Metal Works, Inc.* v. *Silver,* 154 Conn. 116, 127, 222 A.2d 220 (1966); *Doroszka* v. *Lavine,* supra.

The subject of punitive damages has been one of great debate throughout the course of American jurispru-

dence. For present purposes, an exhaustive recitation of these debates is not warranted. Various authorities have discussed the many facets of the propriety of punitive damages and their measure in civil cases and have offered conflicting views.[36] Although various justifications, such as the elements of deterrence and punishment, have been offered in favor of the availability of punitive damages, it has recently been stated that "[c]ountless cases remark that such damages have never been 'a favorite in the law.' " *Smith* v. *Wade*, 461 U.S. 30, 103 S. Ct. 1625, 1641, 75 L. Ed. 2d 632 (1983) (Rehnquist, J., joined by Burger, C.J., and Powell, J., dissenting). Typically, those who disfavor punitive damage awards in civil cases point to the prospect that such damages are frequently the result of the caprice and prejudice of jurors, that such damages may be assessed in amounts which are unpredictable and bear no relation to the harmful act, and that the prospect of such damages assessed in such a manner may have a chilling effect on desirable conduct. See *Smith* v. *Wade*, supra, 1641–42, and authorities cited therein.

In permitting awards of punitive damages, but limiting such damages as we do, our rule strikes a balance—it provides for the payment of a victim's costs of litigation, which would be otherwise unavailable to him, while establishing a clear reference to guide the jury fairly in arriving at the amount of the award.[37] Further, although our rule is a limited one, when viewed in light of the ever rising costs of litigation, our rule

---

[36] Excellent discussions may be found in the following: Long, "Punitive Damages: An Unsettled Doctrine," 25 Drake L. Rev. 870 (1976); Owen, "Punitive Damages in Products Liability Litigation," 74 Mich. L. Rev. 1258 (1976); Walther & Plein, "Punitive Damages: A Critical Analysis: *Kink* v. *Combs*," 49 Marquette L. Rev. 369 (1965).

[37] With regard to the plaintiff's claim, raised on its cross appeal, that the trial court erred in refusing to accept evidence of the defendants' wealth and income, since it is quite clear that such evidence has no bearing on the determination of litigation expenses, the court's evidentiary rulings in that regard were proper.

does in effect provide for some element of punishment and deterrence in addition to the compensation of the victim. Thus, in limiting punitive damage awards to the costs of litigation less taxable costs, our rule fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury. We therefore decline the plaintiff's invitation to depart from our rule limiting common law punitive damages to the expense of litigation less taxable costs.

There is error in part, the judgment is set aside and the case is remanded for a new trial in accordance with this opinion.

In this opinion the other judges concurred.