[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This proceeding arises out of the exercise of the state's right of eminent domain in which the Commissioner of Transportation acquired all of certain premises situated in Waterbury, Connecticut leased prior to the date of taking from F.T.C. Realty, LLC to Standard Petroleum Company. The premises were operated by Standard Petroleum as a gasoline filling station in which there also existed accessory retail, non-petroleum uses, i.e., a convenience store and a donut shop. The date of the subject taking was March 28, 2002.
At this point a limited and/or brief history of the condemned parcel is appropriate. As the result of a public sale in 1981, one Francis D. Calabro became the owner of the subject premises which carry the designation of 30 Reidville Drive, Waterbury. He thereafter erected a four thousand (4000) square foot building that was subsequently leased to two disinterested, at this point, entities; the first, being United Electrical Contractors and, thereafter, to a corporation known as Speeds, Incorporated, which conducted a copy machine enterprise. Sometime in the early 1990s, the Department of Transportation reconfigured Exit 25 off 1-84 East, locating the exit ramp directly in front of the property at issue.
At that particular time, Standard Petroleum had manifested no interest whatsoever in the property. Recognizing the potential future use of the property, Calabro sought a special exception as a result of the relocation of the exit ramp. That relocation would cause the property to be visible from 1-84 and be easily accessed by eastbound traffic on and off with minimum contact with local traffic, creating a very desirable location for a filling station. The Zoning Board of Appeals, on October 17, 1994, voted unanimously to approve Calabro's petition for a special exception. Subsequent to that action, Calabro formed a corporation called F.T.C. Realty, LLC. He conveyed the property to the corporation on May 31, 1995. After the expiration of some two (2) or three (3) negotiating CT Page 1005 sessions between Calabro and Standard, the parties executed a lease agreement for this property. The consideration therefor was "mutual promises, covenants and agreements herein contained and in consideration of the rents hereinafter reserved. . . ." The term of the lease was from the date on which Standard first commenced pumping gasoline or making retail sales and September 1, 1995, whichever first occurred. The initial rental was five thousand ($5000) dollars a month. Prior to the commencement of the tenancy, Standard was given the right to use and occupy the property for the purpose of the conversion of the building to a convenience store and installing the retail gasoline delivery systems, pumps and tanks, for an additional two thousand ($2000) dollar rental per month.
The notice of condemnation and the assessment of damages under date of March 28, 2002 was directed to F.T.C. Realty, LLC; Standard Petroleum Company; Waterbury Donuts, Inc.; Texaco Food Mart; and the City of Waterbury. It set the assessment at six hundred fifty thousand ($650,000) dollars. Counsel for Standard Petroleum quite accurately notes that there was no delineation or allocation within such statement of compensation of the respective portions of said deposit which the state was depositing for the benefit of the landlord or for the benefit of the tenant or any other entity.
Standard claims to be entitled to a certain amount of that award and asserts that certain items are personalty as opposed to fixtures, which was the determination made by the state. The "personalty" claimed by Standard consists of (1) a twelve thousand (12,000) gallon fibercoated double walled tank with a leakage monitor; (2) an eight thousand (8000) gallon fibercoated double walled tank; (3) an eighteen hundred ninety plus or minus (1890±) square foot canopy; (4) twin electric double sided point of purchase dispensers; (5) a twelve by twenty-one (12 X 21) walk-in cooler; and (6) ten by ten (10 X 10) self-contained freezer.
Standard's counsel continues by reciting that the state "has advised both the fee owner and the lessee that the total portion of the SIX HUNDRED FIFTY THOUSAND AND XX/100 ($650,000.00) DOLLARS deposit representing the items described in [what is claimed as personal property] is ONE HUNDRED SEVENTY EIGHT THOUSAND EIGHT HUNDRED AND XX/100 ($178,800.00) DOLLARS, thus assigning to the realty, unimproved and unenhanced by these items, a deposit of FOUR HUNDRED SEVENTY ONE THOUSAND TWO HUNDRED AND XX/100 ($471,200.00) DOLLARS." That premise may well be an oversimplification as the question may turn upon whether or not the items cited are indeed personalty, as Standard claims, or fixtures, as the state and FTC claim. To reiterate, the subject items were determined by the state to be fixtures and properly included within the value of the CT Page 1006 land for condemnation purposes.
"[I]t is essential to constitute a fixture that an article should not only be annexed to the freehold, but that it should clearly appear from an inspection of the property itself, taking into consideration the character of the annexation, the nature and the adaptation of the article annexed to the uses and purposes to which that part of the building was appropriated at the time the annexation was made, and the relation of the party making it to the property in question, that a permanent accession to the freehold was intended to be made by the annexation of the article."Capen v. Peckham, 35 Conn. 88, 94 (1868); Stone v. Rosenfield,141 Conn. 188, 192 (1954). "The intention of the parties, objectively manifested as of the date when the personalty was attached to the freehold, is the primary or essential test for determining whether an object has become a fixture. Cleaveland v. Gabriel, 149 Conn. 388, 391,180 A.2d 749. . . ." (Citations omitted.) Merritt-Chapman ScottCorporation v. Mauro, 171 Conn. 177, 182 (1976).
Merritt-Chapman goes on to state: "In Lesser v. Bridgeport-City TrustCo., 124 Conn. 59, 198 A. 252, an action against a mortgagee who had foreclosed a mortgage secured by land and a building specially adapted for bowling alleys . . . the court stated the general rule (p. 64): "There is a strong tendency as between mortgagor and mortgagee to hold that such articles are a part of the realty whereas, in the case of landlord and tenant or other holder of a limited term, the tendency is the other way. The reason for this rule is that the owner of the equity is presumed to make improvements for the permanent benefit of the property, while a mere tenant is more likely to make them for his personal convenience. . . ." [E]special stress should be given to whether a building was specifically adapted to certain uses. If so adapted, then "the instrumentalities to carry out those purposes are ordinarily considered a part of the realty.
Standard, in support of its position, cites to Waterbury PetroleumProducts, Inc. v. Canaan Oil and Fuel Co., Inc., 193 Conn. 208, 212
(1984). Correctly, it recites that in that case the court specifically held that underground tanks used to store the gasoline sold at retail which were set in concrete cradles, the latter being cemented to the ground, even though buried, remained personalty and did not become fixtures. In Waterbury, the tanks indeed were found to be personalty, however, in that scenario, the tanks were not buried but rested on cradles and required no excavation or other labor or scheme to remove them.
One George McCloskey testified that every tank is a different size and CT Page 1007 diameter, so the size or diameter of the tank determines how deep it has to go into the ground.[1] The tank can be six feet in diameter, eight feet in diameter or ten feet in diameter. They usually are set three feet below the surface. In addition to that, the tank ordinarily sits on a bed of approximately one foot of sand or gravel. In order to remove them, one would be required to remove the approximate three feet of covering material and the approximate one foot of sand or gravel on which the tanks rest. This court has difficulty in finding that the tanks in this case are indeed personalty. While in the declarations of personal property submitted for tax purposes to the city of Waterbury by Standard may well be indicative of an intention to classify them as personalty, such a declaration is also consistent with being a self-serving declaration of the owner. The declaration far from solves the question of intent.
Counsel for F.T.C. would refute Standard's argument on the issue of intent by citing to McCloskey's testimony that the "life expectancy" of the tanks was twenty (20) years, that the lease was for twenty (20) years, and that the term was entered into intentionally ("that's the way it was set up"). The tanks would remain in the ground during their "life expectancy."
Intent is not the subjective intent or undisclosed purpose of the annexer but the intent manifested by his actions. Giuliano ConstructionCo. v. Simmons, 147 Conn. 441, 443 (1960), citing therein Radican v.Hughes, 86 Conn. 536, 542 (1913). Counsel also relies on certain provisions in the lease itself. It provides, inter alia, that the tanks were to be removed at the "lessers (sic) expense if so directed by the lessor in accordance with a subsequent provision.[2] That provision provided upon the termination of the lease for any reason the lessor shall have the option to require that the lessee remove any and all of the underground storage tanks. Counsel's argument that the intent to classify the tanks as fixtures is persuasive, but not controlling. It is being considered with other facts set forth supra.
The court is satisfied that the sign, the canopy, the ten by ten (10 X 10) self-contained freezer and the gasoline pumps may well be considered personal property. However, the concrete pads, islands, anchorages or bases, the subsurface linkage (piping, electrical wiring and circuits and any other underground linkage) and the walk-in cooler are not so categorized in view of the consequences of removal.[3] Lie would assert that the removal of the concrete pads, islands and foundation anchors or bases as well as the subsurface linkages, piping and/or wiring as the case may be, would do little or no damage to the real estate. He recites that it could be torn up and replaced with appropriate material, leaving CT Page 1008 virtually no damage whatsoever. However, one problem one might have with his description of the removal of the concrete pads and anchors as well as all of the subsurface materials, is that the heavy equipment necessary to remove them would be traveling over the septic system for the building. To suggest that such heavy equipment necessary to do this type of work and do no such damage to the system defies logic. He does, nevertheless, provide a substantial insight to some of the problem from a single rather offhand comment. "Can all of it be literally taken apart like an erector set and taken elsewhere? Yes, it can."[4] Nothing in our law is more elementary than that the trier of fact is the final judge of the credibility of the witnesses and the weight to be accorded to their testimony. Appeal of Cohen, 117 Conn. 75, 81 (1933); Fox v. SouthNorwalk, 85 Conn. 237, 242 (1912); Morgan v. Hill, 139 Conn. 159, 161
(1952). A great deal of his testimony is found to be less than persuasive and hardly credible. Particularly on the issues of removal and ensuing damages. In this process, the trier's acceptance and use of testimony on some points does not preclude its rejection of others. Morgan v. Hill,
supra, 162.
Counsel for F.T.C. Realty also argues that the court could and should decide this case without determining whether or not the articles in issue are personalty or fixtures. In support of this proposition, he relies on the lease between the parties. However, his argument is twice flawed. The lease is hardly unambigious on this subject and is not specifically directed to the precise issue. Secondly, it would disregard the time honored standards for such determination. "It is possible, of course, to include it in an automatic termination agreement, a clause containing provisions as to the rights of the lessor and the lessee in the condemnation award, and such provisions are valid and enforceable according to their terms. 27 Am.Jur.2d 22, Eminent Domain, 250; note, 96 A.L.R.2d 1140, 1145, 4; 11 McQuillin [Municipal Corporations (3d Ed. Rev. 1964)] 32.85, p. 465." Waesche v. Redevelopment Agency of NewLondon, 155 Conn. 44, 50 (1967). In this case, there is indeed such a provision as found in Section 15, entitled Eminent Domain, and of the cited section, paragraphs 15.1, 15.3 and 15.5[5]
The content of section fifteen (15) of the lease between the parties as well as the specific noted subsections thereof provide some guidance to the court. Subsection fifteen point five (15.5) indicates that the lessee is not entitled to any damages of the taking under the power of eminent domain whether it be for the whole or a part of the demised premises. It goes on to recite that the lessor shall not be entitled to any separate award made to the lessee for loss or damage to lessee's trade fixtures and removal of personal property, etcetera. It must be here recognized "that LESSOR shall not be entitled to any separate award made to LESSEE CT Page 1009 for loss of or damage to LESSEE'S trade fixtures and removable personal property or for LESSEE'S moving expenses, or for damages for cessation or interruption of LESSEE'S business." Had there been a separate award, this covenant would certainly provide for the fact that such a separate award would belong to the lessee. The fact that an allocation has been made, by learning of such allocation through discovery does not rise to the level of a separate award and, therefore, provides no benefit to the lessee.
Therefore, this court finds that a portion of the one hundred seventy-eight thousand eight hundred ($178,800) dollar fund belongs to the lessee in accordance with the court's finding that the gasoline pumps, the canopy, the ten by ten (10 X 10) self-contained freezer, and the sign, which the court has found to be personalty as opposed to fixtures. In addressing the other so-called personal property as opposed to fixtures, the court's decision is grounded upon the damage necessarily inflicted upon the premises by the removal thereof, together with its finding concerning the gasoline storage tanks. Judgment may enter in accordance with the foregoing.[6]
 ___________________ Moraghan, J.T.R.