[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Trial in the above case was held on April 29 and 30, 1997. Briefs have been submitted and reviewed. Based on my review of the full record, my evaluation of all the evidence, including the credibility of the witnesses, and my consideration of the legal arguments made, I conclude that judgment should enter for plaintiffs in the amount of $10,412.00.
The facts produced at trial indicate the following:
Ideal Kitchen of Hartford, Inc. ("Ideal") was a Connecticut corporation formed in 1985 by Dennis Hirth and Eugene Stursberg, its officers and only stockholders. Its place of business was initially on New Park Avenue in West Hartford, Connecticut. In December of 1986, Ideal entered into a lease with defendant Andre Charbonneau to lease space located at 524 Sullivan Avenue, South Windsor. The lease provided for a security deposit of $2,000 and a term of 5 years at $2,000 per month rent. Ideal was in the business of selling and installing replacement doors and refacing kitchen cabinets. In January of 1987, Dennis Hirth and Eugene Stursberg formed American Kitchen Center, Inc. ("American"). American was established to sell new kitchens, including appliances. Hirth and Stursberg initially were the only shareholders and officers of American.
Shortly after American was formed, Stursberg sold his shares to David Bareiss and resigned as an officer. American and Ideal were located in the space leased from the defendant at 524 Sullivan Avenue, South Windsor. In January of 1987, Ideal changed its name to A. K. Manufacturing at the request of another corporation that was called Ideal Kitchen. Both American and Ideal/A.K. conducted business at the location with the knowledge of the defendant. The rent was paid to the defendant from January of 1987 through April of 1990 by either American or Ideal/A.K. CT Page 8109
In July 1989, Ideal/A.K. moved to Manchester. The defendant knew of this move and the location and telephone number of Ideal/A.K.
In April 1987, American Kitchen borrowed $50,000 from South Windsor Bank and Trust. Hirth signed the note as president of American Kitchen and Hirth and Bareiss co-signed the note, giving guarantees to the bank. Plaintiffs' Exhibit 3A.
American Kitchen gave South Windsor Bank a UCC financing statement and Security Agreement dated April 2, 1987 as security for the note. Plaintiffs' Exhibits 3B, 4A. The UCC financing statement was filed with the Secretary of State, Plaintiffs' Exhibit 4A, and granted South Windsor Bank a security interest in "All inventory, assets, cash on hand and in banks, accounts receivable, equipment, machinery, tooling, supplies, vehicles, furniture, fixtures, and work in process now owned and hereinafter created or acquired." The proceeds of the loan were used to purchase kitchen displays and appliances, which were set up in the leased space.
During the fall of 1988, Bareiss sold his shares in American Kitchen to Donald Boehler for $10,000, and in return for Mr. Boehler's assuming Bareiss' guarantee for the South Windsor Bank loan.
In November of 1989, both Hirth and Boehler sold one third of their interest in American Kitchen to Joseph Romanowski, a/k/a Joseph Roman. In February 1990, Boehler sold the balance of his shares to Joe Roman as did Hirth in May of 1990. Joseph Roman, whose whereabouts are unfortunately now unknown, had been hired to run American Kitchen.
In April 1990, Ideal/A.K. failed to make the rent payment to defendant, who contacted Hirth and told him he might lock the doors of the leased space if not paid. During a meeting in May of 1990 involving Hirth and a potential buyer for American Kitchen, defendant stated he would change the locks if the rent was not paid before 4:00 p. m. On May 21, 1990 Hirth paid the April rent; defendant returned the keys.
Prior to receiving defendant's letter to Ideal Kitchen on June 11, 1990, Roman reported to Hirth that his key no longer worked in the locks for American Kitchen. That same day, Hirth met Roman at 524 Sullivan Avenue and Hirth's key did not work. CT Page 8110 Defendant had changed the locks.
While at the site with Joe Roman, Hirth stated. he looked in the windows and could see all but one of the kitchen displays and all of the appliances. Hirth testified that the twelve kitchen displays, and appliances, were there and that there was nothing missing or out of place. Tr. p. 31; 106.
On or before June 11, 1990, when the locks were changed and Hirth was at the leased premises, Ideal/A.K. owed rent for May 1990 and June 1990. Defendant's Exhibit P. Defendant also held the security deposit of one month's rent.
In June 1990, American Kitchen, now owned completely by Joe Roman, defaulted on the Note to South Windsor Bank. South Windsor Bank had been taken over by Connecticut Bank and Trust Company (CBT). CBT made demand on Hirth and Boehler by virtue of their guarantees and they each gave CBT $9,580 for a total of $19,160 in payment of American Kitchen's note. Consequently, Hirth and Boehler received from CBT an assignment of the security interest American Kitchen had granted South Windsor Bank.
American Kitchen put defendant on notice that the kitchen displays and appliances were security for the loan and demanded they be released. Plaintiffs' Exhibit 6. Hirth and Boehler testified that they, through their attorney, put defendant Charbonneau on notice of their security interest in the displays and appliances. Tr. p. 28-29; 111.
Mr. Charbonneau declined to release the displays and appliances. He testified he probably gave one kitchen to another tenant, Lanza, "because we had to dispose of it." Tr. p. 131, and that his workers might have given kitchen displays away. Tr. p. 131. Defendant testified that he had a new potential tenant for the space and disposed of the rest of the cabinets and displays at the dump in September of 1990. Tr. p. 131, 132.
Although defendant made demand on Ideal/A.K. for the payment of the back rent, he never brought suit against Ideal/A.K. or American Kitchen for the rent. Tr. p. 132.
I agree with plaintiffs that the evidence indicated that in June, 1990, the following kitchen or cabinet displays and related items were in the Sullivan Avenue location, having had the indicated purchase prices (see pages 6-7 of plaintiffs' May 29, CT Page 8111
1997 Post-Trial Brief):
Exhibit Brand/Display Purchase Price
Ex. 7A, 7B, 7G Millbrook White Display $ 9,583 Ex. 7H, 7I Magic Chef Appliances 1,980
Ex. 8B Millbrook 1000 (Beige) Display 4,614 Ex. 8C, D Defiance Refrigerator 2,210
Ex. 9C, D, E Richmaid Cherry Display 6,888 Ex. 10B, C Richmaid Oak #2 Display 2,536 Ex. 11B, 11C Richmaid Oak #1 Display 3,087
Ex. 12E, C Imperial Birch Display 4,244 Ex. 13B, 13C Imperial Oak Display 2,201
Ex. 14B, 14C Wood-Hu Display 2,072
Ex. 15B, 15C Plato Birch 9,150 Ex. 15D Rayburn Countertop 754
Ex. 16B Millbrook Bar 1,760
Ex. 17B Cherbert Duval Cabinets 700
Ex. 18D Schroch Cabinets 3,770
Ex. 19B Business Sign 1,265
Ex. 19C Mirrors 164
Ex. 20A, 20B Seaboard Appliances Dishwasher Cooktop Counter Oven Downdraft Grill Electric 2,959
Ex. 21A, 21B Defiance Refrig.-42 inch 1,935
Total Cost $61,877
The property referred to in the preceding paragraph and chart CT Page 8112 was disposed of by defendant after he changed the locks on the premises.
The plaintiffs subsequently initiated this action. Plaintiffs claim damages and triple damages pursuant to Conn. Gen. Stat. Section 52-564.
ANALYSIS OF LEGAL CLAIMS
Plaintiffs' complaint, dated January 4, 1991, is in one count. It alleges that plaintiffs hold a security interest and are entitled to possession of the property at issue, that defendant has failed to deliver the same, and that defendant has converted plaintiffs' property. Plaintiffs claim damages and triple damages pursuant to General Statutes Section 52-564. Plaintiffs have asserted no other statutory provision in support of their claim for damages.
After considering the full record, I conclude that the plaintiffs have prevailed by a preponderance of the evidence with respect to the allegations in their complaint.
As plaintiffs argue, the evidence indicates that American Kitchen borrowed $50,000, and then granted South Windsor Bank and Trust a security interest. The displays and appliances served as part of the collateral for the loan. When American Kitchen defaulted, plaintiffs each paid $9,580 to the bank. In return, they received an assignment of the bank's security interest in American Kitchen's assets.
Contrary to defendant's argument, there is no evidence of fraud by plaintiffs and no reason to doubt that the assignment of the bank's security interest was a legitimate business transaction for valuable consideration. See Connecticut General Statutes Section 42a-3-201, et seq. As a consequence, Hirth and Boehler acquired the collateral and an interest in American Kitchen's assets.[1]
Both of defendant's special defenses, as well as his cross complaint, are rejected. Defendant has failed to produce sufficient evidence in support of any of them. Defendant's lease was with Ideal/American Kitchen, not Hirth and Boehler individually, as plaintiffs argue. Defendant never brought a legal action against Ideal/American Kitchen. Nor is there a basis, on the present record, to conclude that the plaintiffs are CT Page 8113 individually liable for the debts of Ideal/American Kitchen. I agree with plaintiffs' contention that American and Ideal/American Kitchen were, in essence, locked out. Defendant's actions essentially amounted to a constructive eviction, thus terminating the lease and the duty to pay rent. Cerruti v.Burdick, 130 Conn. 284, 286-87 (1943). Defendant's argument that he was merely exercising his "landlord's lien" (first special defense) does not justify his removal of the displays and destruction of them. At common law, a landlord does not have a lien on the property of a tenant merely by reason of the landlord-tenant relationship. See, Corpus Juris Secundum, "Landlord and Tenant," Section 605; see also Mathews v.Livingston, 86 Conn. 263, 257 (1912). Defendant has cited no contractual provision which would support this claim. Moreover, the Connecticut cases on point are ancient and few. See Griswoldv. Cook, 46 Conn. 198 (1878). The evidence produced also did not support the allegation in the second special defense that plaintiffs sought to "avoid their debt by using their corporate identity to hide their assets by purchasing corporate assets from the bank as individuals," or that they engaged in fraud. Nor are defendant's arguments in reliance on Sections 42a-8-302 and42a-9-504 persuasive, for the reasons plaintiffs set out in their June 13, 1997. reply brief. See Section 42a-3-201 et seq.
I further agree with plaintiffs' view that, given the circumstances of this case, defendant's actions amounted to a conversion of the property at issue. As plaintiffs note, conversion is defined as "an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights. . ." Moore v. Waterbury ToolCo., 124 Conn. 201, 209 (1938). Defendant conceded that he removed the displays, stored them for a time, and then disposed of them. Irrespective of the ongoing dispute in which he was involved, I conclude that he lacked the legal right to do this.
Plaintiffs argue that any award of damages should be tripled pursuant to Connecticut General Statutes Section 52-564, which states that "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages." Because an award of treble damages is "an extraordinary statutory remedy," liability pursuant to this provision of law must be proven by "clear and convincing evidence." Schaffer v. Lindy, 8 Conn. App. 96, 104 (1986). To "steal" commonly denotes "the commission of theft, that is the felonious taking and carrying away of the personal property of CT Page 8114 another, and without right and without leave or consent of owner, and with intent to keep or make use wrongfully." Black's Law Dictionary (6th Edition). In this case, there is no evidence that defendant intended to permanently deprive plaintiffs of the property when he removed it. The evidence, rather, is that that defendant believed in good faith — albeit wrongly — that he could exercise a "landlord's lien" and that he removed and disposed of the property pursuant to this mistaken belief.
Plaintiffs argue that the word "steals" in Section 52-564 is synonymous with the definition of larceny contained in Conn. General Statutes Section 53a-119, see Lauder v. Peck,11 Conn. App. 161 (1987), that larceny is the wrongful withholding of property from an owner, and that defendant's conduct in converting plaintiffs' property should therefore trigger a trebling of damages. The definitions of conversion and larceny are functionally equivalent, plaintiffs argue. Id. at 165-167. However, our Appellate Court has recently analyzed, in depth, the difference between larceny and conversion as it pertains to Section 52-564 in the case of Lawson v. Whitey's Frame Shop,42 Conn. App. 559, (1996). In that case, the Appellate Court found that Section 52-564 was inapplicable, stating at page 606 as follows:
 Pursuant to § 53a-119, "[a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." By comparison, "[c]onversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights." Discover Leasing, Inc. v. Murphy,
supra, 309, citing Devitt v. Manulik, 176 Conn. 657, 660, 410 A.2d 465 (1979). In addition, conversion requires that the owner be harmed as a result of the unauthorized act. Devitt v. Manulik, supra, 660. Conversion may arise subsequent to an initial rightful possession. Maroun v. Tarro, 35 Conn. App. 391, 396, 646 A.2d 251, cert. denied, 231 Conn. 926, 648 A.2d 164 (1994). Conversion can be distinguished from statutory theft as established by § 53a-119
in two ways. First, statutory theft requires an intent to deprive another of his property; second, conversion requires the owner to be harmed by a CT Page 8115 defendant's conduct. Therefore, statutory theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion. In the present case, the trial court did not find that the defendant intended to deprive the plaintiffs of their automobiles. In fact, the trial court stated that "the defendant was acting under an honestly held claim of right." Therefore, the plaintiffs' proof that the defendant converted their property cannot, on its own, support a finding of statutory theft under § 52-564.
Pursuant to a decision released on July 15, 1997, our Supreme Court, while reversing the Appellate Court with respect to the CUTPA counts of plaintiffs' complaint, affirmed the Appellate Court with respect to the conversion counts in the Lawson case.241 Conn. at 691. Consequently, even though defendant's conduct in this case was clearly inappropriate and cannot be condoned, the decision in Lawson, in light of the generally accepted definition of stealing, leads me to conclude that triple damages under Section 52-564 are not called for, given defendant's initial mistaken but good faith belief that he was acting pursuant to a "landlord's lien."[2]
What remains, is perhaps the most difficult issue in this case: determining the amount of damages to be awarded.
The burden of proving damages, of course, rests squarely on the party claiming them. Gargano v. Heyman, 203 Conn. 616, 620
(1987). Mathematical exactitude is not required where precise proof is not feasible. Hassane v. Lawrence, 31 Conn. App. 723,727 (1993). In cases where damages are difficult to prove, such as this one, the plaintiff must prove damages with the precision which the facts permit, but no more. Johnson v. Healy,183 Conn. 514, 515 (1981). Generally, the measure of damages for conversion is the value of the goods at the date of the conversion. Waterbury Petroleum Products, Inc., v. Canaan Oil Fuel Co., 193 Conn. 208, 222 (1984). See also Sanford v. Peck,63 Conn. 486, 494 (1893) ("`Indeed the price for which an article is bought and sold constitutes its market value and is ordinarily the best and most satisfactory standard by which to estimate the amount at which the same or similar articles are to be appraised in the assessment of damages.'" (Citation omitted.); Barker v.Lewis Storage Transfer Company, 78 Conn. 199, 200 (1905) ("The CT Page 8116 cardinal rule is that a person injured shall receive fair compensation for his loss or injury and no more. . .Commonly in cases of conversion the loss is the value of the property. . .Commonly the value of the property as representing the owner's loss is its market value, if it have one, since thereby is indicated the cost of replacing.") See also Dobbs onRemedies (West Publishing Co. 1973), Section 3.4, "Proof of value." The trier of fact may evaluate credibility, and weigh different testimony relating to value in arriving at an award of damages. Gargano v. Heyman, 203 Conn. at 620; Tait and Laplante'sHandbook of Connecticut Evidence, Section 3.1 (2nd Edition 1988).
Plaintiffs claim that they are entitled to $61,877 in damages. This claim is based largely on Mr. Hirth's testimony and evidence reflecting that the cost of the displays when purchased were $51,364; the costs of the appliances were $9,084; and the costs of the sign and mirrors were $1,429.
I agree with plaintiffs that they are entitled to damages in the amount of $1,429 in connection with the American Kitchen business sign and mirrors. These items had a special and peculiar value to plaintiffs, not to the general public. WaterburyPetroleum, supra, at 222-223; Barker v. Lewis Storage TransferCo., supra, at 200.
Based on the full record and the reasonable inferences drawn from the evidence, and acknowledging the varying evidence relating to the appliances, I find that defendant is responsible to plaintiffs for damages resulting from the loss of the appliances. Plaintiffs seek damages in the amount of $9,084, the cost. Michael E. Laureno, defendant's expert, whose testimony will be discussed at greater length shortly, testified that he "usually ended up selling" such items to employees at cost or somewhat less than cost. Tr. p. 142. Based on this testimony, which I credit, and in light of the full record, I conclude that damages for the appliances should be awarded in the amount of 75 percent of cost, or $6,813.00.
Plaintiffs also claim that they are entitled to $51,364 in connection with the kitchen displays. Based on the full record, I conclude that this figure is significantly high. The parties are referred to the Supreme Court's analysis in upholding the awarding of only salvage value damages in Lawson v. Whitey'sFrame Shop, 241 Conn. 678, 688-690. I conclude that Mr. Laureno's testimony as to the value of the kitchen displays was CT Page 8117 fundamentally persuasive. Plaintiffs argue that Mr. Laureno's testimony as to the value of the displays should not be credited for various reasons, see plaintiffs' post-trial brief at page 15. These arguments do not substantially alter my view of Mr. Laureno's testimony or the significance to be attached to it. I found him to possess significant experience and expertise generally, and found him to be credible. He was able to base his opinions, in part, on a viewing of photographs of the displays introduced by plaintiffs. He said that such displays typically have only "junk" value, and are worth somewhere between $10 and $20 per box. Transcript at 137. He concluded, see transcript pages 151-154, that the maximum total sale value of the displays was approximately $2,170. To summarize and simplify, his view that the displays' values were nowhere near their purchase value was based on his opinion that the displays were not generally suitable for use in a kitchen; that they were approximately two years old by 1992; that they may have been nicked up or marked up; and that they might suffer slight damage when being removed.See transcript pages 135-144; 154-55. Plaintiffs did not produce any evidence of a consummated transaction as to any display for an ongoing business, or any business, from which a reasonable conclusion could be drawn as to market value. Having considered the full record, I conclude that the most appropriate way to determine the value of the displays in this case is to determine their market value at the time they were removed, and that plaintiffs have failed to demonstrate by a preponderance of the evidence that the market value even remotely approximated cost. Therefore, I credit Mr. Laureno's testimony and award damages for the displays in the amount of $2,170, calculated by adding up Mr. Lauretano's testimony as to the maximum potential value of the displays. Tr. p. 152-154.[3]
Summary and Conclusion
Judgment shall enter for plaintiffs on their complaint in the total amount of $10,412.00. Judgment shall also enter for plaintiffs on defendant's cross complaint.
Douglas S. Lavine Judge Superior Court