******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CITY OF STAMFORD ET AL. *v.* TEN
RUGBY STREET, LLC
(AC 36803)

Keller, Mullins and Schaller, Js.

*Argued October 19, 2015—officially released March 22, 2016*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Hon. Edward R. Karazin, Jr., judge
trial referee.)

*Thomas M. Cassone*, for the appellant (defendant).

*James V. Minor*, special corporation counsel, with
whom, on the brief, was *Kathryn Emmett*, director of
legal affairs, for the appellees (plaintiffs).

*Opinion*

SCHALLER, J. The defendant, Ten Rugby Street, LLC, appeals from the judgment of the trial court ordering the defendant to cease operation of a rock crushing enterprise or of a preparation recycling operation at 10 Rugby Street, Stamford (property), and issuing a permanent injunction preventing the defendant from operating any crushers on the property without a special exception. On appeal, the defendant claims that the trial court (1) failed to interpret or apply the Stamford zoning regulations (regulations) correctly, and (2) violated the defendant's due process rights by exceeding the scope of the cease and desist order in issuing an injunction that went beyond the relief requested by the plaintiffs, the city of Stamford and James J. Lunney III, zoning enforcement officer for the city of Stamford. We affirm the judgment of the trial court.

The following facts, as found by the court, and procedural history are relevant to our discussion. On June 21, 2010, Lunney issued a cease and desist order to the defendant.[1] The order required in part that the defendant "was to cease a rock crushing operation, a recycling preparation operation and a material transfer site."[2]

On September 20, 2011, the plaintiffs filed a verified complaint, alleging that the defendant had failed to comply with the cease and desist order. The court held a hearing over three days during which it heard testimony from Lunney, Antonio Vitti, Sr., owner of the defendant, and several residents of neighboring properties. The court also admitted numerous exhibits, including photographs and videos of the activities conducted on the property. The court issued a memorandum of decision on April 30, 2014. It summarized the facts, in relevant part, as follows:

"Mr. Vitti, Sr., has been in business in the city of Stamford since 1967 [hereinafter Vitti and his associated companies, including the defendant, Ten Rugby Street, LLC, are] collectively called [Vitti].[3] [Vitti] rented vehicles, sold fill, trap rock, and accepted and stored and separated excavation materials from others. He also sold the separated and reclaimed materials. He was a licensed excavator. In 1976, [Vitti] purchased M-G [general industrial zone] property at 35 Harbor Street, and continued his same operation there until 1979, when he expanded into the abutting 10 Rugby Street lot pursuant to a lease with Gotham Technology . . . . In 1998 [Vitti] purchased 10 Rugby Street and continued the same operations, and leased back a part of the building portion of the premises to Gotham. . . .

"Throughout, [Vitti] excavated [his] own materials and stored and separated them on-site, as well as accepting the materials of others; and with both activities separated, stored and sold them. The primary materials excavated, accepted, separated and stored by the

defendant have been road building and construction site materials such as blacktop, concrete, bricks, gravel, dirt, sand and fill."

The plaintiffs asserted at trial that the defendant's activities included crushing both rock and non-rock materials in violation of the regulations, and operation of a recycling preparation operation, which required a special permit. The defendant maintained that it was not in violation of the zoning regulations.

The court granted the plaintiffs' request for a permanent injunction. The court concluded that the defendant's actions were barred on several grounds. It found that (1) any "crushing" is barred in the zoning district in question, an M-G zone; (2) the "primary business" of the defendant is "recycling large amounts of other contractors' *excavation, construction and demolition material* by crushing and shredding this material into a marketable product such as gravel or clean fill" (emphasis in original); (3) the defendant conducted a "recycling preparation operation" as defined by § 82.1 of the regulations, without the required special exception; (4) the defendant's use was not a valid nonconforming use; and (5) a contractor's material and equipment storage yard is for storage of material, rather than for processing it. It determined that it would not issue a fine, as the defendant had not wilfully violated the regulations, but it granted a permanent injunction "requiring the defendant, Ten Rugby Street, LLC, to comply with zoning regulations at the Ten Rugby Street property; to cease the operation of any crusher on Ten Rugby Street; to comply with the cease and desist order dated [June 21, 2010], to wit: that the said defendant cease to illegally utilize, or to permit to be so utilized, the premises located at 10 Rugby Street to operate a rock crushing enterprise or to conduct a preparation recycling operation without a special exception; and a permanent injunction from continuing violations of zoning regulations." We will set forth further facts as necessary.

Following the trial court's decision, the defendant appealed to this court. The defendant filed a motion for articulation, which the trial court denied.[4] This court granted review of the trial court's order denying the motion, and subsequently denied the requested relief.

On appeal, the defendant claims that the trial court (1) failed to interpret or apply the regulations correctly, and (2) violated the defendant's due process rights by exceeding the scope of the cease and desist order in issuing the injunction.[5] In considering the first issue, we consider whether the defendant's primary business, as found by the trial court, is permitted on a "contractor's material and equipment storage yard and building," or any other use category permitted as of right in Stamford. We next consider whether the defendant's primary business is specifically prohibited by the zoning regula-

tions because it constitutes operation of a recycling preparation operation without a special exception. Finally, we consider whether the defendant's primary business is permitted as a prior existing use. We then turn to the defendant's claim that the trial court violated the defendant's due process rights by exceeding the cease and desist order and complaint.

I

INTERPRETATION OF ZONING REGULATIONS

The defendant claims that the court misinterpreted the regulations. We disagree. At the outset, we identify the applicable standard of review. As the interpretation of regulations poses a question of law, our review is plenary. See *Driska* v. *Pierce*, 110 Conn. App. 727, 732, 955 A.2d 1235 (2008). Where the trial court has made findings of fact, however, "our review is limited to deciding whether such findings were clearly erroneous." (Internal quotation marks omitted.) *Johnnycake Mountain Associates* v. *Ochs*, 104 Conn. App. 194, 200, 932 A.2d 472 (2007), cert. denied, 286 Conn. 906, 944 A.2d 978 (2008).

We next set forth the relevant legal standards. "[Z]oning regulations are local legislative enactments . . . and, therefore, their interpretation is governed by the same principles that apply to the construction of statutes. . . . Moreover, regulations must be interpreted in accordance with the principle that a reasonable and rational result was intended . . . ." (Internal quotation marks omitted.) *Thomas* v. *Planning & Zoning Commission*, 98 Conn. App. 742, 745, 911 A.2d 1129 (2006). "Our Supreme Court has instructed that courts should avoid interpretations that could result in absurd [and] unworkable . . . results." (Internal quotation marks omitted.) *Trumbull Falls, LLC* v. *Planning & Zoning Commission*, 97 Conn. App. 17, 24, 902 A.2d 706, cert. denied, 280 Conn. 923, 908 A.2d 545 (2006).

The parties agree that the regulations are permissive in character. Where "[t]he regulations are permissive in character . . . [t]he uses which are permitted in each type of zone are spelled out. Any use that is not permitted is automatically excluded." *Gordon* v. *Zoning Board*, 145 Conn. 597, 604, 145 A.2d 746 (1958). The regulations classify uses of property as permitted uses or uses subject to approval by the Zoning Board of Appeals, also known as special exceptions. Stamford Zoning Regs., art. III, § 5. At trial, Lunney also described permitted uses as uses "as of right," and explained that while property owners "should" get a use permit when they change the use of their property from one permitted use to another, there was generally no reason not to issue a use permit if they met other zoning requirements. According to the regulations, special exceptions, on the other hand, "shall be granted by the reviewing board only upon a finding that the proposed use or

structure or the proposed extension or alteration of an existing use or structure is in accord with the public convenience and welfare after taking into account [a variety of considerations, including location, nature of the use, traffic patterns, the nature of the surrounding area, and the Master Plan of the City of Stamford]." Stamford Zoning Regs., art. V, § 19, 3.2.

A

Permitted Uses

The defendant argues that the court was incorrect in finding that crushing of non-rock materials such as concrete, blacktop, and cement (crushing non-rock materials), one aspect of its primary business as found by the trial court, is not within any of the permissible use categories for the zone in which the property is located. The trial court found that the property is situated in an M-G (general industrial) district, although it abuts on residential property.[6] Our primary inquiry, therefore, is whether any use listed for the general industrial district would permit crushing non-rock materials. As we explain below, we make this determination by considering the definition of "contractor's material and equipment storage yard and building" in the regulations, other parts of the regulations, the testimony of Lunney, and case law. See *Vivian* v. *Zoning Board of Appeals*, 77 Conn. App. 340, 345, 823 A.2d 374 (2003) ("[a] court must interpret a statute as written . . . and it is to be considered as a whole, with a view toward reconciling its separate parts in order to render a reasonable overall interpretation" [internal quotation marks omitted]); *Balf Co.* v. *Planning & Zoning Commission*, 79 Conn. App. 626, 635–36, 830 A.2d 836 ("the position of the municipal land use agency is entitled to some deference" [internal quotation marks omitted]), cert. denied, 266 Conn. 927, 835 A.2d 474 (2003); *Builders Service Corp.* v. *Planning & Zoning Commission*, 208 Conn. 267, 276, 545 A.2d 530 (1988) ("[w]here a statute or regulation does not define a term, it is appropriate to focus upon its common understanding as expressed in the law" [internal quotation marks omitted]).

The defendant maintains that it is using the property as a "contractor's material and equipment storage yard and building," which is a permitted use as of right in a general industrial district, as well as in C-S (shorefront commercial) and M-L (light industrial) districts.[7] Stamford Zoning Regs., art. III, § 4 A. The trial court found that use of the property as a contractor's material and equipment storage yard and building would not include crushing non-rock materials. The regulations do not define a "contractor's material and equipment storage yard and building"; we, therefore, look to the plain language of the term, the term's place in the regulatory scheme, and interpretation of the term by the city of Stamford and by other courts in order to determine

whether crushing non-rock materials would be permitted. Our analysis of whether crushing non-rock materials would be permitted in a contractor's material and equipment storage yard and building informs our broader determination of whether crushing non-rock materials is permitted in any permissible use category.

We turn first to the plain language of the phrase, "contractor's material and equipment storage yard and building." The defendant argues that the term is ambiguous because it "involves a conjunction and is unpunctuated . . . ." The defendant further argues that one interpretation is that the word storage is only modified by equipment, such that the term could be separated into " 'contractor's material yard' " and " 'contractor's equipment storage yard' . . . ." The defendant maintains that this construction would impose no limitation on what the contractor could do with its material on-site. We do not perceive the same ambiguity. If the term contained commas, e.g., "contractor's material, and equipment storage, yard and building" or "contractor's material, and equipment storage yard and building," it would be susceptible to the defendant's interpretation. In the absence of these commas, we conclude that the meaning is clearly a yard and building used by a contractor to store materials and to store equipment. Storage does not suggest that crushing large amounts of material would be contemplated. Henceforth, we refer to a "contractor's material and equipment storage yard and building" as a "contractor's yard."

Other parts of the regulatory scheme support the conclusion that crushing non-rock materials is not permitted in a contractor's yard, or in any other permitted use within a general industrial district. First, the regulations specifically note that crushing is barred in a sand and gravel pit or in a sand and gravel bank with the blanket statement, "no crushing."[8] The defendant asserts that the trial court erred in concluding that crushing non-rock materials would be barred in a contractor's yard based on its being barred in these two use categories. It asserts that the court impermissibly extended the ban on crushing in these two use categories to all of Stamford, despite Lunney's concession that the two categories were inapplicable to the defendant. In contrast, we find the court's interpretation persuasive; we conclude that the regulations specifically bar crushing in these two areas because they are the two areas in which crushing was most likely to occur, and we infer from this that the regulations bar crushing non-rock materials elsewhere.

The special exception required for excavations provides further support for the conclusion that crushing of non-rock materials is barred in a contractor's yard, and in a general industrial zone. The defendant contends that the court could not have used the special exception as grounds for barring crushing non-rock

materials on the property because the trial court could not have concluded that the defendant's use constituted excavating on the property. According to the defendant, Lunney testified that the defendant was not operating an excavation site on the property, and therefore the trial court should not have relied on the requirements for an excavation site. We interpret the import of the special exception differently than the defendant does, in accordance with the trial court's interpretation. Pursuant to the regulations, any excavation of more than one hundred cubic yards not already permitted under a building permit requires a permit issued by the zoning enforcement officer. Stamford Zoning Regs., art. IV, § 15 A. The regulations require an excavator who intends to crush rocks to apply for a special permit, and otherwise bar "processing of excavated materials on the premises except with a simple bar type screen to remove oversize aggregates and used only for loading of trucks."[9] Id., § 15 A 3 a. They further state that "[n]o material brought to the site shall be processed by crushing." Id., § 15 A 5. We conclude that the specific requirements this section of the regulations places on "rock crushing" and the processing of other excavation materials by crushing provides further support that crushing non-rock materials is barred.

These sections of the regulations (the bans on crushing in other uses and the strict limitations on rock crushing while excavating) suggest that crushing non-rock materials is barred. Each provides further support for the conclusion that crushing non-rock materials is not permitted in a contractor's yard, or in another use area which does not clearly state that crushing non-rock materials is permitted.

We also look to the interpretation of the zoning authorities, principally the zoning enforcement officer. Lunney testified that in a contractor's yard, the defendant could sell crushed stone that he had bought elsewhere, but he could not crush items or change their shape. He testified: "And he is not—he is not a contractor where he's buying something and selling it. He's making the product from a method that he is not allowed to use on that site."

Lunney explained that he had not issued a cease and desist order earlier because he had not witnessed a violation taking place until recently. He also testified that he required the defendant to remove the rock crushing equipment in the cease and desist order because it was the only way to ensure that the defendant did not crush any rocks.[10] We conclude that Lunney's interpretation, as found by the trial court, provides further support for our conclusion that crushing non-rock materials is not permitted in a contractor's yard, or in any other use area which does not clearly state that crushing non-rock materials is permitted.

Neither this court nor our Supreme Court has had

cause to determine the scope of permissible activities in a contractor's yard with reference to activities similar to those in the present case. In *Ogden* v. *Zoning Board of Appeals*, 157 Conn. App. 656, 658–59, 117 A.3d 986, cert. denied, 319 Conn. 927, 125 A.3d 202 (2015), this court upheld the defendant Columbia zoning board of appeals' determination that that plaintiff's use of his property "for the outside storage of vehicles, equipment and trailers and a wholesale operation for the distribution of landscaping materials" fit within the definition of a "construction/contractor's yard." (Internal quotation marks omitted.) In that case, this court did not consider whether activities similar to those in the present case would also be within the definition of a contractor's yard. Several judges of the Superior Court have interpreted similar terms when interpreting the zoning regulations of other cities. In *301 Eagle Street, LLC* v. *Zoning Board of Appeals*, Superior Court, judicial district of Fairfield, Docket No. CV-11-6015612-S, 2012 WL 802881, *13 (February 16, 2012), a judge of the Superior Court considered whether the Bridgeport zoning regulations permitted crushing and cutting metal in a contractor's storage yard. The judge found that "the ability to store metals on a contractor storage yard may not be extended to a use which buys and sells metals, crushes metals, cuts them, moves them with heavy equipment, and trucks the metal off-site to a facility in Norwalk." Id. Likewise, in *Papoosha* v. *Zoning Board of Appeals*, Superior Court, judicial district of Middlesex, Docket No. CV-01-0096322 (September 12, 2003) (35 Conn. L. Rptr. 576, 576, 579), the trial court determined that a garden center, permitted by special exception, was barred from "stockpiling and processing of earth products . . . ." In *Brookside Nurseries, Inc.* v. *Zoning Board of Appeals*, Superior Court, judicial district of Stamford-Norwalk, Docket No. FA-05-4003653-S (May 1, 2007) (43 Conn. L. Rptr. 323, 324–26), the trial court recited the definition of "contractor's storage yards" from the Norwalk Zoning Regulations,[11] then held that processing of humus, sand, leaf compost, clay, basalt rock, peanut shells, and sawdust by blending with machinery to form "ecosoil" was not a use contemplated by the definition of contractor's storage yards. Each of these interpretations is consistent with our interpretation.

The defendant also has claimed that crushing non-rock materials is permissible as an accessory use in a contractor's yard. Although Lunney alluded to this in his testimony, we need not reach this issue because the trial court specifically found that "the primary business is recycling large amounts of other contractors' excavation, construction and demolition material by crushing and shredding this material into a marketable product such as gravel or clean fill." (Emphasis omitted.) An accessory use must be dependent on a principal or main use. *Loring* v. *Planning & Zoning Commis-*

*sion*, 287 Conn. 746, 767, 950 A.2d 494 (2008), see also *Papoosha* v. *Zoning Board of Appeals*, supra, 35 Conn. L. Rptr. 580 ("[t]he magnitude of the proposed production activity, in terms of the hours of operation and the size of the screener, suggests that the plaintiffs never intended for the preparation of topsoil to be an accessory use, subordinate and minor in significance to the primary use of the garden center"). Having reviewed the evidence, we conclude that the court's factual determination that crushing and recycling was the primary use of the defendant's property was not clearly erroneous. Therefore we need not reach the issue of whether crushing or recycling of a smaller scale could be a valid accessory use.

On the basis of the foregoing analysis, we conclude that the plain meaning of "contractor's yard" does not permit crushing non-rock materials as the primary use. On the basis of our plenary review of the regulations, we determine that there is not another use category permitted as of right in a general industrial district that would permit crushing non-rock materials.

B

Recycling Preparation Operation

The defendant argues that the court improperly concluded that the defendant's primary business in crushing or sorting excavation, construction, and demolition material brought by others for resale fits within the definition of a recycling preparation operation in article II, § 82.1, of the regulations. If it does, then the defendant is barred from using the property in this manner without a special exception permit.

The regulations define a recycling preparation operation, in relevant part, as: "(a) An operation of a recycling/transfer facility solely for the collection, compacting, crushing, shredding, baling, pulverizing, separation, sorting and consolidation of solid waste materials, including newspapers, paper and cardboard materials, construction materials, demolition materials, wood products, plastics, tires, rags and similar materials for reclamation and volume reduction purposes and for transfer to other sites for final reprocessing, reclamation, conversion or change of form. (b) No garbage, putrescent, toxic, biomedical or hazardous waste shall be allowed on the premises. No incineration shall be permitted on the premises and no stockpiling or storage of any materials shall be allowed outside of the enclosed building. There shall be no reprocessing, conversion or change of form of such materials on the premises and all separated and sorted materials shall be transferred to other sites for final reprocessing, reclamation, conversion, incineration or other disposition. (c) All activities shall be conducted within an enclosed building . . . . (d) Within the M-G General Industrial District the site shall be not less than one and one-half acres

if used for multiple purposes and . .. shall have access and entry from two or more streets not more than 1 mile from an entrance to the Connecticut Turnpike." Stamford Zoning Regs., art. II, § 82.1.[12]

The court found, on the basis of multiple exhibits entered into evidence, that demolition or construction materials were processed by the defendant. This included concrete, cement, blacktop, and steel rebar from the demolition of buildings. It noted that the defendant had held itself out as a recycling operation, advertising that "A. Vitti Recycling, Inc. offers . . . recycling services . . . blocks . . . rocks, concrete . . . black top . . . ." (Citation omitted.) It concluded that the defendant lacked a special exception from the zoning board or other necessary approvals, yet was "operating a recycling operation-material transfer site in violation of the regulations . . . ."

The defendant contends that the non-rock materials it processes are not recyclable materials; therefore, the section does not apply. The defendant argues that "solid waste materials" referred to in § 82.1, do not include the non-rock materials that it processes. In aid of this contention, it cites to a variety of definitions of waste, none of which we find illuminating, then looks to the Stamford Code of Ordinances (ordinances) regarding garbage, rubbish, and refuse removal. It cites to the ordinances' definition of municipal solid waste as "[g]arbage, offal, rubbish and waste from residential, commercial, industrial and institutional sources, excluding solid waste consisting of significant quantities of . . . bulky waste . . . and materials which have been declared as recyclable in Article IV of Chapter 137." Stamford Code of Ordinances, art. I, § 137-1 (A). Bulky waste is defined as "[l]and-clearing debris and other waste resulting from construction and demolition debris . . . ." Id. Recyclables are defined in a latter section as "[a]ny of the following items: cardboard, glass food and beverage containers, leaves, metal food and beverage containers, newspaper, office paper, scrap metal, storage batteries, waste oil and recyclable plastics. . . ." Id., art. IV, § 137-29. The defendant contends that concrete, cement, and blacktop do not fit into the definition of municipal solid waste in the ordinances; therefore, they are not solid waste under § 82.1.

In his testimony, Lunney questioned the applicability of the ordinances.[13] We agree that their relevance is limited, as they concern a different area of municipal regulation: waste disposal rather than zoning. Moreover, our interpretation of the ordinances differs from the defendant's interpretation. Municipal solid waste appears to be a subset of solid waste, as are bulky waste and recyclables.[14] The solid waste materials contemplated by § 82.1 of the regulations would consist of recyclables per the ordinances, as well as the construction and demolition materials noted in the definition of

bulky waste. This interpretation is aided by General Statutes § 22a-207, which defines solid waste and municipal solid waste separately.[15] This statutory definition, like the ordinances, is for the purpose of waste disposal, rather than zoning.

The defendant asserts that the terms construction materials and demolition materials in § 82.1 refer only to plaster, drywall, wood, roof shingles, and the like that are normally discarded. The defendant then cites to Lunney's statement that he did not witness any of these materials at the property. The court found significant evidence of processing and crushing of non-rock materials that originated from demolished buildings and roads, on the basis of videos and the defendant's own advertisements.[16] The defendant's argument implies that non-rock materials are not normally discarded, but the defendant does not provide information as to what is typically done with them after the building, road, or bridge that is composed of them is demolished. The court found that, in this case, they are crushed, processed, and reused. It is counterintuitive that the definition of recycling preparation operation would only provide for recycling of materials which are thrown away, rather than items which are commonly recycled. We conclude that the trial court did not err in concluding on the basis of the evidence before it that the non-rock materials processed by the defendant resulted from demolition or construction activities, and therefore fit within any reasonable definition of construction and demolition materials.

The court included excavation in its description of the defendant's primary use of the property. The court referred to "recycling large amounts of other contractors' excavation, construction and demolition material . . . ." (Emphasis omitted.) In addition, the court found that "[t]he primary materials excavated, accepted, separated and stored by the defendant have been road building and construction site materials such as blacktop, concrete, bricks, gravel, dirt, sand and fill," and that "most of the material that was processed by him was foundation and road material."

These findings indicate the court's determination that considerable overlap exists among construction, demolition, and excavation materials. We note that § 82.1 does not refer to "excavation materials" as a separate category of materials. However, to the extent that "excavation materials" may constitute a category of materials distinct from construction and demolition materials, we conclude that the excavation materials that the trial court found the defendant crushed (blacktop, concrete, bricks) are similar to construction and demolition materials. We are persuaded, therefore, that the trial court reasonably could have concluded that they fit within the residual phrase "and similar materials" in the definition of solid waste materials in § 82.1.

The court's findings indicate that the defendant was crushing solid waste materials for resale. Therefore, it was required to comply with § 82.1, including obtaining a special exception permit and otherwise following the other regulatory requirements for a recycling preparation operation. The court properly found that the defendant had not done so, and therefore was in violation of the regulations.

## C

### Prior Existing Use

The defendant contends that its use of the property should be permitted as a prior existing use. It asserts that its present use existed prior to the enactment of the current definition of the phrase recycling preparation operation. In addressing this contention, the trial court concluded that the defendant had not demonstrated that its use preceded the enactment of zoning regulations in Stamford.

We first review those facts relevant to this claim. The trial court found the following: "In 1976, [Vitti] purchased M-G property at 35 Harbor Street and continued his same operation there *until 1979, when he expanded into the abutting 10 Rugby Street lot* pursuant to a lease with Gotham Technology, which was a chemical factory that manufactured solvents that cleaned boilers and furnaces." (Emphasis added.) It later found the following: "In the early days of his operation he crushed all of the materials with a thirty-five ton bulldozer going up and down on top of the materials and then he screened the materials. (In 1979 he had a bulldozer as a crusher and a shredder and then new equipment.) *In 1990–1991 or 1992 he began expansion into 10 Rugby Street.* Periodically the lot is empty. Sometime during 2012 and 2013 the lot was empty. He admits the operation is now a bigger operation. In 2000 he got new machines, a crusher and a shredder that all do the same type of things." (Emphasis added.) On the basis of these findings, it is unclear whether Vitti began operating at the property in 1979 or in 1990–91, but it is clear that 1979 was the earliest possible time at which he could have done so, and that he has expanded his use of the property significantly since 1990.

As of October 6, 1978, the definition of recycling preparation operation was "[a]n operation involving solely the collection of glass and nonferrous metals and the collection, compacting and baling of cardboard and trash paper. It being specifically understood that no processing, crushing of glass or compacting or baling of metals may be done on the premises. All storage and operations must take place inside an enclosed building." The current definition of recycling preparation operation, as stated in the prior section, was enacted in 1990.[17]

"General Statutes § 8-2 (a) provides in relevant part

that zoning regulations shall not prohibit the continuance of any nonconforming use, building or structure existing at the time of the adoption of such regulations. Such regulations shall not provide for the termination of any nonconforming use solely as a result of nonuse for a specified period of time without regard to the intent of the property owner to maintain that use. . . . A nonconformity has been defined as a use or structure [that is] prohibited by the zoning regulations but is permitted because of its existence at the time that the regulations [were] adopted. . . . For a use to be considered nonconforming . . . that use must possess two characteristics. First, it must be lawful and second, it must be in existence at the time that the zoning regulation making the use nonconforming was enacted. . . . The party claiming the benefit of a nonconforming use bears the burden of proving that the nonconforming use is valid." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Cumberland Farms, Inc.* v. *Zoning Board of Appeals*, 74 Conn. App. 622, 627–28, 814 A.2d 396, cert. denied, 263 Conn. 901, 819 A.2d 836 (2003).

In considering this claim, we again note that the regulations are permissive. We also note that the defendant bears the burden of proving that the prior existing use exception applies. The defendant therefore was required to prove either that its use preceded the enactment of zoning altogether, or that it was at one time a permitted use, and has since ceased to be permitted due to new regulations. The court found that the defendant's use did not precede the enactment of zoning regulations.[18] The defendant has not provided any reference suggesting that its use of the property had been permissible prior to 1990, when the current version of § 82-1 rendered its use subject to a special exception.[19] The change in the definition of recycling preparation operation does not demonstrate that the defendant's use of the property was previously permitted. A change in the definition rendering a given use of a property controlled by that definition and subject to a special exception could indicate either that the use was previously permitted, or that the use was previously barred. Given our prior discussion regarding the permissive nature of the regulations, the definition of a contractor's yard, and our conclusion that crushing non-rock materials as a primary use is not permitted except where specifically authorized by the regulations, we conclude that the defendant has not demonstrated that its use of the property was permissible, then rendered impermissible due to a change in the regulations. The court was therefore correct that it was not a prior existing use.

On the basis of all of the foregoing, we conclude that the trial court correctly found that the defendant's primary activity of "recycling large amounts of other contractors' excavation, construction and demolition material by crushing and shredding this material into

a marketable product"; (emphasis omitted); was not permitted by the regulations. This is not the end of our inquiry, however. We must now look to whether the scope of the court's order impermissibly exceeded the scope of the relief sought in the complaint and in the cease and desist order.

## II

### SCOPE OF REMEDY

The defendant claims that the trial court's order exceeded the scope of the cease and desist order and the complaint and therefore violated its due process rights.[20] We disagree. We first set forth the standard of review and applicable law.

"The following standard of review applies to the review of a trial court's ruling on an injunction. The issuance of an injunction and the scope and quantum of injunctive relief rests in the sound discretion of the trier. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion."[21] (Internal quotation marks omitted.) *Welles* v. *Lichaj*, 136 Conn. App. 347, 354, 46 A.3d 246, cert. denied, 306 Conn. 904, 52 A.3d 730 (2012). "How a court balances the equities is discretionary but if, in balancing those equities, a trial court draws conclusions of law, our review is plenary." (Internal quotation marks omitted.) *New Breed Logistics, Inc.* v. *CT INDY NH TT, LLC*, 129 Conn. App. 563, 571, 19 A.3d 1275 (2011). "The interpretation of pleadings is an issue of law. As such, our review of the court's decisions in that regard is plenary." (Internal quotation marks omitted.) *Stamford Landing Condominium Assn., Inc.* v. *Lerman*, 109 Conn. App. 261, 271, 951 A.2d 642, cert. denied, 289 Conn. 938, 958 A.2d 1246 (2008).

"The allegations of a complaint limit the issues to be decided on the trial of a case and are calculated to prevent surprise to opposing parties. . . . It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint. . . . The purpose of a complaint . . . is to limit the issues at trial, and . . . pleadings are calculated to prevent surprise. . . . It is fundamental to our law that the right of a [party] to recover is limited to the allegations in his [pleading]. . . . Facts found but not averred cannot be made the basis for a recovery." (Citation omitted; internal quotation marks omitted.) Id. "[W]here the trial court ha[s] in fact addressed a technically unpleaded claim that was actually litigated by the parties, it [is] improper for the Appellate Court to reverse the trial court's judgment for lack of such an amendment [to the complaint]." *Stafford Higgins Industries, Inc.* v. *Norwalk*, 245 Conn. 551, 575, 715 A.2d 46 (1998).

"Whether a complaint gives sufficient notice is determined in each case with reference to the character of the wrong complained of and the underlying purpose of the rule which is to prevent surprise upon the defendant. *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, 193 Conn. 208, 223–24 n.16, 477 A.2d 988 (1984)." (Internal quotation marks omitted.) *Stamford Landing Condominium Assn., Inc.* v. *Lerman*, supra, 109 Conn. App. 274.

The defendant claims that the court's determination that "all 'crushing' or processing is prohibited by [the] Stamford zoning regulations was made in violation of [the defendant's] due process rights" because it exceeded the scope of the cease and desist order. It asserts that the trial court granted relief that went beyond the four corners of the cease and desist order by enjoining the defendant from processing excavation materials, and from crushing non-rock materials. Resolving this issue requires us to consider the pleadings, the court's memorandum of decision, and the issues actually litigated at trial. It also requires careful consideration of the distinction between the trial court's interpretation of the regulations, its factual findings, and its orders.

In discussing the verified complaint, the court stated that "[p]aragraph 7 of the Cease and Desist Order alleges zoning violations. They consist of the operation of an illegal preparation recycling operation, a rock crushing enterprise, as well as a material transfer site. Despite the Order to Cease and Desist, the defendant did not cease and desist. The plaintiff[s] [claim] that the defendant continues to violate the regulations. The defendant denies any violations. The City claims the cease and desist [order] is violated as follows: a. The defendant continues to utilize, or to permit the subject premises to be utilized illegally, as a preparation recycling operation within the M-G Zoning District; b. The defendant continues to utilize, or to permit the subject premises to be utilized illegally, as a rock crushing operation with the M-G Zoning District; c. The defendant continues to utilize, or to permit the subject premises to be utilized illegally, as a material transfer site within the M-G Zoning District; d. The defendant has, by its above described illegal use of the subject premises, caused an adverse impact on the adjacent residential multifamily neighborhood through the creation of significant noise, dust and physical vibrations, thereby destroying the peace and quiet enjoyment of said adjacent residential neighborhood and thereby reducing the quality of life therein."

Vitti acknowledged that the defendant was told to cease crushing of non-rock materials.[22] Lunney noted in his July 28, 2010 letter to his file: "[Vitti] is running a rock crushing, blacktop crushing, concrete crushing, recycling operation and recycling preparation opera-

tion, as defined by [section] 82.1 of section 3 of the zoning regulations of the City of Stamford Zoning, [without] the proper approvals." Lunney testified that all crushing was prohibited, acknowledged that concrete crushing was not rock crushing, and maintained that the "recycling aspect" was the source of the ban on crushing concrete. Lunney also testified that he told Vitti that all crushing was barred.[23] Vitti testified that the same machine, a blue crusher, could be used for sorting, crushing of non-rock materials, and crushing rock.[24]

The trial court in its memorandum of decision defined rock as naturally occurring material. It then ruled: "The defendant insists that [it] is not crushing rocks, so therefore further examination is moot since, if [it] is enjoined from doing something [it] isn't doing, then there is no harm to the defendant." Shortly thereafter, it ruled: "It is incomprehensible to this court that only rock crushing could be regulated by a special permit, yet all other crushing of any other materials could be done at will. The philosophy of the regulations is to control activities such as this.

"The court finds the allegations of paragraph 7 [of the cease and desist order, as stated in the complaint] to be proven by a fair preponderance of the evidence. The court finds the defendant was operating a recycling operation-material transfer site in violation of the regulations, and was crushing and sorting construction and road materials and the like, also in violation of the regulations.

"All of the facts stated in this decision are 'found' by this court."

After determining that the defendant's conduct was not wilful and, therefore, did not merit the imposition of any fines, the court ordered as follows: "The court grants a permanent injunction requiring the defendant, Ten Rugby Street, LLC, to comply with zoning regulations at the Ten Rugby Street property; to cease the operation of any crusher on Ten Rugby Street; to comply with the cease and desist order dated [June 21, 2010], to wit: that the said defendant cease to illegally utilize, or to permit to be so utilized, the premises located at 10 Rugby Street to operate a rock crushing enterprise or to conduct a preparation recycling operation without a special exception; and a permanent injunction from continuing violations of zoning regulations."

In its memorandum of decision, the trial court made factual and legal determinations as a necessary component of its determinative process which were not specifically contemplated in the cease and desist order and complaint. In determining whether the defendant was engaged in the practice of operating a recycling preparation operation, it was necessary for the court to deter-

mine whether the defendant's crushing of construction and demolition materials meant that it was engaged in a recycling preparation operation. This required the court to determine whether those activities fit under any permitted use category. The court's determination that crushing non-rock materials did not fit within a permitted use category was a necessary component of its determination that a recycling preparation operation is the only use in the regulations that contemplates the defendant's primary business, as found by the trial court, of "recycling large amounts of other contractors' *excavation, construction and demolition material* by crushing and shredding this material into a marketable product such as gravel or clean fill." (Emphasis in original.) Moreover, the defendant was aware that Lunney interpreted the regulations to bar all crushing, not simply rock crushing.[25] The defendant was on notice, having received the cease and desist order and the complaint claiming that it was barred from operating a recycling preparation operation, that it could be barred from crushing construction and demolition materials.

The defendant also argues that the court impermissibly enjoined it from processing excavation materials. As we determined in analyzing the meaning of a recycling preparation operation in § 82.1, the court properly found that any excavation materials processed by the defendant fall within the residual "and similar materials" provision of § 82.1. The defendant bases this claim on the trial court's finding "that a 'contractor's yard' is for storage of materials and equipment, and not for processing of material and not for cutting and processing metal.[26] The court [found] that the definition of 'contractor's yard' should not be read so broadly as to make meaningless other definitions that have restrictions here concerning no crushing." We conclude that this finding was a necessary component of the court's analysis of a recycling preparation operation. In order to determine whether the defendant's actions in processing excavation, construction, and demolition materials were barred by the definition of recycling preparation operation, the court needed to determine whether they were permissible in a contractor's yard, or another permitted use category. Having done so, it could then determine that processing excavation, construction, and demolition materials was barred by the recycling preparation operation definition as it entailed "sorting and consolidation of solid waste materials, including . . . construction materials, demolition materials . . . and similar materials . . . ." Stamford Zoning Regs., art. II, § 82.1.[27]

The injunction also orders that the defendant cease the operation of any crusher. To the extent that the defendant was using the crushers to screen excavation, construction, and demolition materials, in addition to using them to crush excavation, construction, and demolition materials or rocks, the defendant will be

barred from doing so. To the extent that screening material brought by others qualifies as recycling, the defendant will be barred from that.[28] Lunney testified that removing the crushers was the only way to make the defendant cease crushing rocks.[29] The trial court was within its discretion to grant the injunction requiring removal of the crushers, even though it may also prevent the defendant from screening his own material using the crushers.[30] Screening the defendant's own material was not listed in the cease and desist order, but it was within the court's discretion to determine that the only way to prevent the defendant from crushing in violation of the regulations was to order the removal of the crushers, even if they can also be used for screening. The injunction concludes with the broad statement that the court is granting "a permanent injunction from continuing violations of zoning regulations." We take this as a concluding summation which does not enjoin any further activity other than that specifically listed previously in the paragraph.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] "Pursuant to General Statutes § 8-12, the plaintiff, as the zoning enforcement officer, is vested with the power to enforce the city's zoning code. See *Enfield* v. *Enfield Shade Tobacco, LLC*, 265 Conn. 376, 378, 828 A.2d 596 (2003)." *Driska* v. *Pierce*, 110 Conn. App. 727, 728 n.2, 955 A.2d 1235 (2008).

[2] The trial court did not analyze the meaning of material transfer site; we take the trial court's reference to a material transfer site to also refer to the recycling preparation operation, which is defined in the regulations in relevant part as "[a]n operation of a recycling/transfer facility solely for the collection . . . of solid waste materials . . . for transfer to other sites for final reprocessing, reclamation, conversion or change of form." Stamford Zoning Regs., art. II, § 82.1; see discussion in part I B of this opinion.

[3] The court described the factual background for this case with reference to Vitti himself and his various companies, even though the only defendant is Ten Rugby Street, LLC.

[4] The defendant requested that the trial court articulate the distinction between crushing material and screening material, the meaning of the terms "crusher" and "rock crushing," the scope of the injunction, the basis for the court's finding that the defendant was operating a recycling preparation operation, and the meaning of "demolition" and "solid waste" materials. In denying the motion, the court ruled that its memorandum of decision had properly and completely addressed these issues.

[5] The defendant also claims that the trial court erred in adopting the new interpretation by Lunney and disregarding his predecessors' interpretations of the zoning regulations, in that prior zoning enforcement officers had not found the defendant's activities to violate the regulations. When asked whether there was a difference of opinion between him and prior zoning enforcement officers regarding the interpretation of the regulations, Lunney testified that he was not aware of one, but acknowledged that where a term was undefined, "three people could look at it and have a slightly different view of it."

In support of its claim that there was a prior interpretation, the defendant points to Vitti's testimony, and the failure of prior zoning enforcement officers to find a violation. The defendant did not assert the existence of a prior interpretation in its answer and special defenses, and made only passing reference to the existence of a prior interpretation in its opening arguments. The defendant did assert that there was a prior interpretation in its posttrial memorandum of law. The court did not make a finding that any prior interpretations had been made, and the defendant failed to request an articulation of whether prior interpretations had been made. Pursuant to Practice Book § 61-10 (b), "this court will not decline to review a claim on appeal solely on the basis of a party's failure to seek an articulation." (Emphasis omitted; internal quotation marks omitted.) *Murcia* v. *Geyer*, 151 Conn.

App. 227, 231 n.1, 93 A.3d 1189, cert. denied, 314 Conn. 917, 100 A.3d 406 (2014). This court has previously stated that this section does not absolve a defendant of that defendant's duty to preserve the record or prevent the court from declining to review a claim where the record is inadequate for reasons other than the failure to seek an articulation. Id. The existence of a prior interpretation would have been a question of fact for the trial court. As we stated in *Gordon* v. *Gordon*, 148 Conn. App. 59, 67–68, 84 A.3d 923 (2014), "[t]he record contains no findings by the court with regard to the defendant's claim . . . . Cognizant that we must make every reasonable presumption in favor of the correctness of the court's decision . . . we are left to conclude on the basis of our review of the limited record provided that the court acted reasonably . . . ."

[6] The defendant asserts that the complaints of neighboring property owners have been a driving influence on the plaintiffs' decision to pursue this action after previously allowing the defendant to conduct its operations.

[7] The defendant frequently notes that the general industrial district is the most heavily industrial district in Stamford, but in interpreting a specific use, such as a "contractor's material and equipment storage yard and building," it should be noted that a given use may be maintained in other zones.

[8] A sand and gravel pit is only permitted in a general industrial district subject to a special exception, yet crushing is barred; this further militates against the defendant's argument that because the property is in a general industrial district, crushing should be permitted.

[9] The regulatory text provides in relevant part: "3. Conditions: a. There shall be no processing of excavated materials on the premises except with a simple bar type screen to remove oversize aggregates and used only for loading of trucks. Except for rock crushing as permitted under paragraph 5 below, there shall be no processing of excavated materials on the premises except with a simple bar type screen to remove oversize aggregates and used only for loading of trucks. . . .

"5. Regardless of the amount of material excavated, any rock crushing activity shall require application to and issuance of a Special Exception by the Zoning Board in accordance with the standards and procedures of Section 15-A, Section 19 and the special standards as set forth below. . . . No material brought to the site shall be processed by crushing. All material processed by rock crushing shall be used on site exclusively pursuant to a valid plan of improvements . . . . Any violation of any conditions of approval or any standards of this regulation shall be cause for immediate stoppage of the operation and revocation of the permit." Stamford Zoning Regs., art. IV, § 15 A 3 and 5.

[10] We discuss the import of the distinction between crushing in general and crushing rocks in part II of this opinion.

[11] The definition for contractor's storage yards cited by the court in *Brookside Nurseries*, *Inc.*, was "[a] parcel of land, with or without structures, a minimum of 12,500 square feet in size, used for the storage of contractor's equipment and materials used in the construction trade; including, but not limited to, trucks, vans, bulldozers, backhoes and other similar equipment customarily associated with a contractor and or stockpiles of construction materials, such as concrete, gravel, woodchips, masonry, plumbing or electrical supplies, and other similar materials. All such equipment and material shall be stored in an environmentally safe manner behind the front setback line and no closer than five feet (5) to the side or rear property lines. All such stockpiles shall be limited to a maximum height of twenty feet (20) and shall be effectively screened from view from adjacent properties." (Internal quotation marks omitted.) *Brookside Nurseries*, *Inc.* v. *Zoning Board of Appeals*, supra, 43 Conn. L. Rptr. 324.

[12] Although the definition also contains the phrase "no reprocessing," the trial court referred to the defendant's activities as "processing" and the definition permits crushing, shredding, and pulverizing, all of which describe the defendant's activities. Our use of "processing" refers to the activities listed in § 82.1 (a): collection, compacting, crushing, shredding, baling, pulverizing, separation, sorting, and consolidation; rather than "reprocessing."

[13] As Lunney testified: "Well, you're not comparing the same thing. You're comparing municipal solid waste, which is set up for people who are going to do recycling out of their house, in a section that is not related to the zoning code. It's more of a city code. And then, zoning regulations, and the intent of the zoning regulations, and the term isn't even the same. One is solid waste. And one is municipal solid waste. So, I don't know how you can [conclude] the definitions are the same."

[14] The defendant upends this relationship by assuming that solid waste and municipal solid waste are identical: "And also, bulky waste, listed as

an exclusion from 'Municipal Solid Waste' . . . is not solid waste and so even if excavation materials are bulky waste, they are not regulated by 82.1." To the contrary, municipal solid waste, bulky waste, and recyclables are subsets of solid waste, and § 82.1 defines another subset of solid waste containing materials which the ordinances define as bulky waste or recyclables.

[15] General Statutes § 22a-207 provides in relevant part: "Definitions. For the purposes of this chapter and chapter 103b . . .

"(3) 'Solid waste' means unwanted or discarded solid, liquid, semisolid or contained gaseous material, including, but not limited to, demolition debris, material burned or otherwise processed at a resources recovery facility or incinerator, material processed at a recycling facility and sludges or other residue from a water pollution abatement facility, water supply treatment plant or air pollution control facility . . .

"(23) 'Municipal solid waste' means solid waste from residential, commercial and industrial sources, excluding solid waste consisting of significant quantities of hazardous waste as defined in section 22a-115, land-clearing debris, demolition debris, biomedical waste, sewage sludge and scrap metal . . . ."

[16] While questioning Lunney, the defendant's attorney attempted to classify materials that resulted from digging up a road as excavation materials. Lunney testified: "Now, if you're excavating a road, then that's not excavation materials anymore. That's kind of like a demo. You're demoing the road. And that's different."

[17] The definition was also amended in 1996, but the defendant has not claimed that this amendment altered the applicability of the definition to it.

[18] The defendant asserts that Vitti began his business in 1967, therefore it has been engaged in this use since that date. We conclude that the date in question would be when Vitti commenced use of the property for crushing or recycling activities, not when he or his business began those activities at a different property. Regardless, Vitti did not start his business prior to 1951, when Stamford first enacted its zoning regulations.

[19] If the defendant did have a prior nonconforming use, it would be restricted from expanding that use. The trial court made numerous findings suggesting that his use had expanded significantly since 1990, but did not quantify the level of activity that would have been permissible under a prior nonconforming use since 1990.

[20] The plaintiffs argue that as the due process issue was not presented to the trial court, it is not reviewable. Because they have failed to brief this issue adequately, we consider the defendant's argument.

[21] "In seeking an injunction pursuant to [General Statutes] § 8-12, the town is relieved of the normal burden of proving irreparable harm and the lack of an adequate remedy at law because § 8-12 by implication assumes that no adequate alternative remedy exists and that the injury was irreparable. . . . The town need prove only that the statutes or ordinances were violated." (Internal quotation marks omitted.) *Bauer* v. *Waste Management of Connecticut, Inc.*, 239 Conn. 515, 532–33, 686 A.2d 481 (1996).

[22] On cross-examination by the plaintiffs, Vitti testified as follows:

"Q. So, would you agree with me that over the years and your testimony today is, I don't crush rock?

"A. No. I never intended to crush rock.

"Q. Okay. And you think that you're legal in crushing concrete, blacktop, brick?

"A. For the previous people that I dealt [with] after 2010, it was legally.

"Q. But you'd also agree that Mr. Lunney says in 2010, Tony, you can't do it, and, I'm going to have to go to court?

"A. Right. That's why we're here today to straighten 'em out to see what's wrong or right. I don't know why. That's what I'm doing here today."

[23] In rebuttal testimony, the plaintiffs questioned Lunney as follows:

"Q. Mr. Lunney, what did you tell Mr. Vitti in July, 2010, at the meeting that you've already heard testimony about and . . .

"Q. Did you tell him it was okay, he could do anything he wanted, including crushing automobiles, except for rock crushing? . . .

"A. No. . . .

"Q. All right. Did you tell him that he couldn't crush blacktop?

"A. Yes.

"Q. He couldn't crush brick?

"A. Yes.

"Q. He couldn't crush concrete block?

"A. Yes.

"Q. Any kind of block?

"A. Yes.

"Q. All right. And you told him that he was recycling?

"A. Yes.

"Q. And he couldn't do it?

"A. Yes."

[24] Vitti testified on direct examination regarding the multiuse machines that he uses:

"Q. All right. And when did you start using new types of machines?

"A. I used a new type of machine, it was after two—you know, I don't remember exactly, but beginning 2000, before 2000.

"Q. Around 2000 and before 2000?

"A. Yeah, something like that.

"Q. Okay. And the new type of machine, what would you call the new type of machine when you started using it?

"A. You call the crusher, you call the shredder, you call the screen. You got seven type of different type of machine.

"Q. And what—do they all do the same thing?

"A. They all do the same thing. It's similar if you go to the supermarket and you buy grind meat, meat—you grind . . . meat. That machine could change the parts inside. You could grind the meat. You could grind the cheese. You grind tomato. You could grind anything you want in there.

"That's what the crusher is, what the screen is. You change the parts inside, and you do what kind—any kind of work that you want to do."

[25] On redirect examination, the plaintiffs' counsel questioned Lunney as to what crushing Lunney claimed constituted a violation:

"Q. Mr. Lunney, is it a violation of zoning to crush rock?

"A. Yes.

"Q. Is it a violation of zoning to crush blacktop?

"A. Yes.

"Q. Is it a violation of zoning to crush concrete?

"A. Yes."

[26] We agree with the defendant that the reference to "metal" here is an incongruity. Aside from the removal of rebar during the crushing process, no references to metal were made during the trial. We assume that the court's reference to metal here was inadvertent. Rather than surmising as to the court's intention, we ignore the clause, "not for cutting and processing metal."

[27] Lunney specifically testified on cross-examination by the defendant as follows:

"Q. And although in your cease and desist orders, you've ordered Mr. Vitti to remove the rock crushing equipment, you weren't talking about pro-screen; right?

"A. No, I was not.

"Q. And you knew it was there; correct?

"A. Yes, I did.

"Q. And so you didn't feel that it was a violation to have this pro-screen machine there; correct?

"A. I didn't think that it was a violation of the—what I had asked him to stop doing, which was rock crushing and recycling. The screening aspect of it was not something that I was addressing; correct."

Lunney's testimony suggests that he was uncertain whether use of the screener, by itself, would be a violation, but that use of the screener was not the subject of his cease and desist order.

[28] Lunney does suggest that screening one's own material could be an accessory use in a contractor's yard; this issue has not been presented to us and we do not reach it.

[29] Upon redirect examination of Lunney by the plaintiffs, he testified as follows:

"Q. So, in your mind, the only way to prevent him from crushing rocks is by removing the rock crusher.

"A. That's correct."

[30] The most informative reference to crusher in the trial court's decision is in the facts section: "[I]n 2000 [Vitti] got new machines, a crusher and a shredder that all do the same type of things. He changes the inside parts. The wheels, spin and crush in an impactor and then it screens the materials." We take it that these new machines, which can be used as crushers, shredders, and screeners, are those which are the subject of the injunction.

---